No. 38,404

STATE OF KANSAS, *Appellee,* v. NATHANIEL GERMANY, *Appellant.*

(245 P. 2d 981)

Opinion filed July 3, 1952.

*Elisha Scott, Sr.,* and *Charles S. Scott,* both of Topeka, argued the cause, and *John J. Scott,* of Topeka, was with them on the briefs for the appellant.

*Harold H. Harding,* county attorney, of Kansas City, argued the cause, and *Harold R. Fatzer,* attorney general, and *Paul Wilson,* assistant attorney general, both of Topeka, and *J. Milton Sullivant,* assistant county attorney, and *Francis J. Donnelly,* assistant county attorney, both of Kansas City, were with him on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: Appellant was duly charged by an information filed in the district court of Wyandotte county with the crime of murder in the first degree in shooting and killing David W. Gray. Upon a trial the jury found him guilty as charged and fixed the punishment at death. Defendant has appealed and contends that

the court erred in (1) overruling his motion for a new trial; (2) that the verdict is contrary to law and not sustained by the evidence; (3) that the court erred in refusing to instruct upon second degree murder and the several degrees of manslaughter; (4) that the court gave other erroneous instructions; (5) that a purported written confession and various statements made by defendant were involuntarily given and the court erred in admitting various incriminating evidence; and (6) that defendant was prejudiced by certain remarks made by counsel for the state in his closing argument.

A brief history of the court proceedings may be given. On October 31, 1947, the county attorney filed a complaint in the city court charging that Nathaniel Germany shot and killed David W. Gray on October 28, 1947, in Wyandotte county. A warrant was issued upon the complaint, a preliminary examination was held on November 21, 1947, and defendant was duly bound over for trial upon a charge of murder in the first degree. On November 26, 1947, the county attorney filed with the clerk of the district court an information charging appellant with the crime of murder in the first degree. When the case was about to go to trial defendant's counsel on January 19, 1948, applied to the court to appoint a commission to determine if defendant was mentally competent to go to trial. The court sustained the motion and appointed three medical doctors and specialists in the field of psychiatry to examine defendant for that purpose. The commission duly examined defendant and made a report in writing, which included a finding that defendant was then insane and not able to comprehend his position and to make his defense to the charge against him. Upon this report the court ordered that the defendant be committed to the state hospital for dangerous insane at Larned for safe keeping and treatment, and further ordered that upon his recovery he be returned to the district court of Wyandotte county to be placed on trial on the information filed against him. Defendant was forthwith delivered to the hospital named, where he was confined and treated until November 6, 1950, when the superintendent of the hospital advised the county attorney of Wyandotte county that defendant would be released from the hospital and delivered to the sheriff of Wyandotte county. The superintendent of the hospital included in his order of release a finding that the defendant "was not afflicted with a psychosis of any type." Defendant was removed and placed in the custody of the sheriff of Wyandotte county. In the meantime an amended

information had been filed on January 20, 1948, the sufficiency of which is not challenged. On January 3, 1951, defendant's counsel filed a second application requesting the appointment of a commission to examine the defendant as to his mental condition and his capacity to comprehend his position and to make a defense to the charge contained in the information. The court granted this application and appointed a commission consisting of specialists in the field of psychiatry, who examined the defendant on January 5 and filed with the court its written report finding the defendant was sane, was able to comprehend his position and to make his defense to the crime with which he was charged. The trial began on January 8, 1951, and continued through January 19.

When the defendant was arraigned upon the information he stood mute and the court entered a plea of not guilty for him. After the jury was empanelled and sworn counsel for the state, out of the presence of the jury but in the presence of defendant and his counsel, advised the court that the state planned, among other evidence, to introduce evidence of certain oral and written statements made by defendant against his interest and amounting to a confession the admissibility of which would depend upon whether the statements were voluntarily made, and suggested to the court that a hearing be had before the court to determine the admissibility of that testimony before he made his opening statement, as he desired to refer to those matters if the testimony was held to be admissible. Defendant's counsel objected to having that hearing before the opening statement and urged that counsel for the state make the opening statement first and that the court hear the evidence as to the admissibility of the evidence later. That plan was followed. Counsel for the state made an opening statement which included a general statement as to all of the evidence the state planned to introduce. Thereafter the jury, having been duly admonished, as it was at all times when not actually sitting as jurors, and the court in the presence of defendant and his counsel heard the evidence pertaining to the admissibility of the evidence the state contemplated presenting having to do with the oral and written statements made by defendant. This consumed more than half a day. The court held the statements to have been voluntarily made and that they would be admissible in evidence. Counsel for defendant then made an opening statement in which, among other things, he said the evidence would show where defendant was the night of the homicide

and also would show defendant was insane on October 28, 1947, and that he was insane prior thereto, the same as the commission found him to be in January, 1948, and in effect the evidence would show that he was not entirely normal at any time during his life, and specifically stated:

"I will not ask this jury to turn him loose in the streets. No! I ask that he be given that care and medical treatment as provided by law and remove him from society in that humane and understanding way so that the same thing cannot happen to anyone that is near and dear to you, they can be benefited by his absence under medical care."

The trial proceeded. The record disclosed that David W. Gray was eighteen years of age September 5, 1947. He was about 6 feet 2 inches tall, weighed about 150 pounds, and was the son of David F. Gray and his wife, who for many years had been highly respected citizens of Wyandotte county. David F. Gray had been a successful and well-known and well-liked teacher in the high school. At the time of the homicide, soon to be noted, David W. Gray had completed the high-school work and was a student in the Kansas City Junior College. One of his classmates in the high school and in the Junior College was Mary Lou Johnson, and they had been keeping company for perhaps two years prior to the homicide.

The story of the homicide is not controverted. David W. Gray was not living, the defendant did not take the witness stand, and Mary Lou Johnson was the only witness who testified respecting the homicide. By the time of the trial she was married and her surname was Hughes. She testified to having been a classmate with David W. Gray in high school and in Kansas City Junior College and to having kept company with him for about two years; that on the evening of October 28, 1947, the sorority of the Junior College to which she belonged was having a meeting at the home of a Mrs. Modrell. Probably at school that day she had an appointment with David after the meeting at the Modrell home. It seemed to be a practice for the boys of the school to meet the girls at the close of their sorority meetings for whatever they had planned later in the evening. David met her there about 10 o'clock p. m., perhaps a few minutes later. They drove first to a place called "Allen's Drive-in" on State Avenue, a few blocks east of Eighteenth street. This was a place where the Junior College students met for visiting and for soft drinks. They had cokes, visited a few minutes and got in David's car, a 1937 Packard convertible sedan, the top of which was a light color, and drove about some of the streets of the western

part of Kansas City and west on U. S. 40 perhaps two miles, where they turned onto a road known as Muncie Ridge Road, one of the several highways which connect U. S. 40 with State Highway 32, which is an east and west state highway a few miles south of U. S. 40. The Muncie Ridge Road is paved with macadam, has numerous curves, and, generally speaking, runs in a northeasterly-southwesterly direction between the two highways. On what we will call the south side of the road—really southeasterly—there was an unfenced area of timber and brush with no improvements. On the north side of the road quite a few houses had been built, for the most part fairly well separated. They stopped the car, with the right wheels on the shoulder and the left wheels on the pavement, at a point about twenty-five feet west of a house situated on the north side of the highway and sixty-three feet from the edge of the road, which had a light burning on the front. It was a pleasant evening for that time of year, a full moon was shining, and either the full lights or the parking lights on the car were left burning. The windows on the front doors of the car were up. The couple sat in the front seat of the car and visited for a time estimated by Miss Johnson as thirty to forty minutes. They were then alerted by someone rapping on the window of the left front car door. They looked and Miss Johnson observed a Negro standing outside the car by the door with a gun in his hand. He said: "Open the door. Open the door." The voice was unusual in that it was a low medium voice and it seemed to be slow and hard to understand. Either he or David opened the door and the man said: "Give me your wallet." David gave the man his wallet. Miss Johnson was a little uncertain about whether the wallet was given to the man or thrown on the pavement, but she gave it as her best judgment that it was given to him. We pause to note that the wallet was never found, although the place was repeatedly and thoroughly searched. The man then said: "I don't want your wallet, give me the keys to your car." David, who by that time was standing on the pavement at the edge of the left front door of the car, which was open, replied: "I will give you the keys as soon as you let this girl get to that house." The man okayed the suggestion and David waved to Miss Johnson with his left hand to get out on the right-hand side of the car and go to the house where the light was burning. She did get out of the car, as he had directed, but instead of going to the house she took two or three steps to the back of the car on the right-hand side. During the time the man was·

there by the car door, where Miss Johnson had a good look at him, she noticed that he seemed to have something about his head and his hair and face, except his eyes, nose and mouth, which tended to make it difficult to see his countenance. But she did notice particularly his eyes and his voice and his general build, and from these matters she was able to identify him positively when she saw him and heard him talk a few days later at the city hall. After David had told her to get out of the car and she had done so the man backed two or three steps toward the rear of the car on the left side and Miss Johnson heard what she thought was a bunch of keys fall on the pavement near his feet. Later the keys were found on the pavement near where the man had stood. About that time the man raised his revolver and shot David W. Gray. Miss Johnson clearly saw him do that. As soon as he was shot David turned and started to run to the west in front of the car. The man who had shot him ran across the road to the timber and bushes. Miss Johnson started to run after David, but did not overtake him until he fell about fifty feet in front of the car. When she overtook him she tried to talk to him and could get no answer. She saw he was seriously injured and tried to get help. She went to the near-by house which had a light burning in front and screamed for help. Someone came to the door, but she got no assistance there. They would not have anything to do with it or stand and watch over David. She was told to go to a house that was northeast on the road, where she could probably get help. She went to that house, but the persons there said they could not help. They did direct her, however, to a house where a Mr. Jackson lived, which was situated north of the highway and on the other side of the car from where she was then. She went back by David, who was still lying on the pavement, and could detect no signs of life. She hurried to the Jackson house, where they received her helpfully and called the police. She returned to where David was. One of the police cars soon arrived and took her to her home. Other peace officers soon arrived on the scene, found David W. Gray lying on the road, dead; managed to take some photographs and promptly instituted an investigation. The body of David W. Gray was taken to a mortuary.

As previously stated, the testimony of Miss Johnson is the only evidence pertaining to the homicide. No witness disputed any part of her testimony and no witness testified to any fact or circumstance tending to dispute it in any way. The jury could not well escape

the conclusion that the shooting was done by one committing a felony, namely, robbery. From Miss Johnson's testimony and the fact that the wallet could never be found, though diligent search was made for it, would justify if not compel the jury in believing that robbery was actually committed. The conclusion that the homicide was murder in the first degree seems inevitable.

The next important question in the case is whether the defendant charged is the person who fired the gun which killed Gray. On that point it may first be said that Miss Johnson definitely identified defendant as the man who fired the shots when she saw him two or three days later at the police station. She identified him by his general build, his movements, and particularly by his eyes, his mouth and his speech which was mellow, low, slow and indistinct. Counsel for appellant mildly criticise that identification. We shall not copy her testimony at length, but we have read it carefully, and if there were no other definite evidence of identification we think there could have been no criticism if the jury had regarded Miss Johnson's identification alone as ample for conviction. There is, however, much other evidence in the record to make the identification unmistakeable.

Being promptly alerted, the peace officers got busy. Two or more men from the police force and two or more from the sheriff's office went to the scene of the homicide, and proceeded to search the premises. They found the keys to the car on the pavement near where the assailant must have stood when he fired the fatal shot. Early the next morning one of them, investigating through the brush directly south of the car, found a worn brown felt hat which he took for a possible clue. Other inquiries and investigations were made the next morning of the persons and premises in the neighborhood. These investigations were continued there and elsewhere for the next two days. Several persons were interrogated, some of them taken to the police station for that purpose, and released. The homicide was on a Tuesday. Two days later, about five o'clock in the evening, two officers of the police department, Joseph Shick, a detective, and Frank Steach, arrested the defendant at his home, 738 New Jersey street, about three or three and one-half miles east of the place of the homicide, and took him to the police station and booked him for vagrancy and suspicion of homicide. Sometime between eight and nine o'clock that evening Officer Shick began talking with the defendant. Officer Shick questioned him about his

whereabouts, where he was working and where he was living, and defendant told him and said that he had been staying with his uncle, Educate Germany, out on the Muncie Ridge Road; that he had gone out there the previous Saturday and stayed there Saturday night, Sunday, Monday and Tuesday and that Educate Germany took him back to his work on Wednesday morning; that while working that morning he developed a toothache and left his place of employment. He said he went to his uncle's home because he and his uncle did a lot of running around together. When he mentioned his uncle's name some of the officers went out to see Educate Germany. They found he lived on the Muncie Ridge Road about two blocks east and a little north of the place of the homicide. He was brought into police headquarters. The officers talked to him about the hat. The hat was shown to defendant, and he was told where it was found. He was asked if it was his, if he had ever worn it, and he answered "No" to each question. Educate Germany spoke up and said: "Boy, that is my hat and you have worn that hat." Defendant then admitted that he had worn the hat but said it was earlier in the evening when he was hunting with a shot gun for rabbits and he had lost it that evening previous to seven o'clock. They kept visiting with him there until sometime between eleven and twelve o'clock defendant said: "Well I shot the boy." The witness Shick was asked to tell what he said concerning it, and he answered:

"He says, I shot the boy. I says, you did? He says, yes. I says, where is the gun? He says, I threw the gun away. I says, where did you throw it? He says, oh, I hid the gun. I says, where did you hide the gun? He says, on my uncle's farm out on Muncie Ridge Road."

Soon after that he was asked if he could find the gun and he said he could and that he was willing to go then to find it. Several officers and his uncle, Educate Germany, went with him. They went out to Educate Germany's premises, down and across a little draw, through some high weeds and grass, to where defendant said he had buried it. It was a rainy, misty night and the grass and weeds were wet, but defendant diligently worked around to find the place where he said he had hidden the gun, but did not succeed in finding it at that time. After about an hour and a half the officers began to think that perhaps defendant was fooling them, although defendant kept insisting that he had scratched out a place with his hands in the dirt and put the gun down and covered it up with weeds and grass. The

parties returned to the police headquarters. The county attorney had called his stenographer to come to the station to take a statement. The statement was taken in the presence of several police officers and Henry Jackson, a first cousin of the defendant, who lived at the same address, 738 New Jersey street, and defendant's uncle, Educate Germany, frequently called "Uncle Eddie." The questions were asked by the county attorney and taken in shorthand by his secretary, Miss MacLeod, and later transcribed by her. It covers eighteen typewritten pages. As each page was typed it was handed to defendant who read it for accuracy, and it was signed. He also signed it at the end and it was witnessed by the police officers.

We need to summarize only the most pertinent portions of this statement. He said he was twenty-three years of age, born in Kansas City and had lived there all his life except for seven or eight years when he was in Oklahoma, but returned in 1942 or 1943; that he had been married and was the father of two children who were living in Detroit, and that for a year he had been living with another woman, whose name he gave, without being married to her; that the gun, which he spoke of as a 32-20, belonged to his cousin, Henry Jackson, who let him have it a week or more prior to the homicide, and that he had given the gun to his Uncle Eddie when they were together down in the bottoms; that on the day of the homicide he and the woman with whom he was living were at his Uncle Eddie's house; that in the afternoon he went hunting with his uncle's shotgun, at which time he was wearing the hat in question, which he said he lost in the brush south of where the homicide occurred; that he got back to his uncle's house about seven o'clock, ate his dinner and then took the 32-20 and his overcoat and went out to an old foundation near the Muncie Ridge Road and lay down for quite awhile; that he saw the car in which David W. Gray was riding and walked down toward it, and while doing so he stopped and put some mud on his face. His reason for doing that was that he had heard of two or three people being raped out on the road and that some thought if a person put mud on his face it would be hard for anyone to recognize him. He put the mud on his face for a disguise. He had the gun, the 32-20, with him. He walked up to the left side of the car and opened the front door. A girl and a boy were in the car. He told them: "This is a hold-up." That he asked for a pocketbook and for the keys to the car; that the boy got out of the car; that he did not take the pocketbook; that the boy threw it on the pavement;

that he did not know why he asked for the pocketbook or asked for the keys to the car; that he stepped back a few steps; that the boy was facing him and was coming to him; that the gun was already cocked, he was pointing the gun at the boy, and it went off; that the boy threw his hand up and turned. He did not see the boy run away and did not see the girl get out of the car and follow the boy; that he himself turned and went across the road and east along the edge of the brush. When he got back to his uncle's house he heard the girl scream and went and hid the gun. He went to the kitchen and washed the mud off his face, and then heard sirens. He went to bed. The next morning when his Uncle Eddie was taking him to work he told his uncle to take care of the hat; that the police might be looking for it. He went to work that day, but he was worried and scared, got the toothache and quit work. He thought of telling his employer about the matter, but was afraid. At sometime that day or the next he told his cousin, Henry Jackson, that a boy had got shot on Muncie Ridge Road and that he had hidden the 32-20. He did this because it was his cousin's gun. He stated he first told officer Shick about shooting the boy; that he was worried and frightened. He was asked: "You knew they would be looking for the gun? A. I was going to tell it anyway. I couldn't have gone on like that."

Soon after the statement was completed and signed the defendant, his Uncle Eddie, the police officers and the county attorney went back to look for the gun and defendant found it at substantially the same place as the night before he said he had buried it. This gun was a 32-20 Smith and Wesson revolver which defendant said he used the night before. It had six chambers, three of which contained loaded cartridges. The other three were empty. The officers took the gun to headquarters.

When the body of David W. Gray was taken to the mortician's and examined it was found that the bullet had entered the body in front of a point about halfway between the left nipple and the center of the breast bone. X-ray examinations showed no bullet in the body, but a hole from which it apparently passed from his body was found in his back somewhat lower down from where it had entered. That evening he was wearing a light wool plaid sport shirt with no jacket. When the shirt was removed from the body a bullet hole was observed in the front of the shirt, but none in the back. A search was made for the bullet. Later, when the heavy iron-

enameled table on which he was placed when brought to the mortuary was moved the mortician found a 32-20 caliber slug which had the pattern of a criss-cross identification on its nose. This was turned over to the county attorney and by him delivered to William J. Myers, a ballistic technician for the Kansas City, Mo., police department, whose qualifications were not questioned. He made repeated tests and by photographs and measurements testified that the slug found by the mortician had been fired from the gun found by defendant which he had buried in his uncle's yard and which he testified had been used at the time of the homicide. So thorough was that demonstration and proof that its reliability is not questioned by counsel for appellant in this court.

From the above it is clear that the identity of the assailant of David W. Gray was established by three lines of testimony—the testimony of Miss Johnson, the confession of the defendant, and the evidence of the ballistic technician. It necessarily follows that appellant's contention in this court that the verdict of the jury was not sustained by the evidence is not well taken.

Counsel for appellant contend that the written statement and the various oral statements made by defendant against his interest, and which amounted to a confession, were improperly received by the court upon the ground that they were not shown to have been voluntarily made. We have carefully considered that question and find it not to be well taken. After the argument of the case in this court counsel for appellant filed a motion asking this court to examine the transcript of the testimony and all exhibits, as well as their abstract and brief. This motion was allowed and we had our clerk send for the transcript and exhibits. The transcript contains 987 pages and there were many exhibits. All of these have been carefully examined. We find that the trial court, with exceptional care and patience, considered all evidence offered by the state (none was offered by defendant) pertaining to whether the oral and written admissions of defendant were voluntarily made. The court found that they were. We concur in the court's judgment on this question after having independently examined the transcript. Aside from what was contained in the written statement there was testimony showing that defendant was nervous, afraid and worried about the police until he had got into a frame of mind, as he stated, that he was going to tell it anyway; he couldn't have gone on like that. Indeed, he was very much like the murderer described by Poe in his "The Tell-Tale Heart." (2 Poe, Raven ed. 352.)

Counsel for appellant complain generally of the instructions, but particularly complain that the court did not instruct on second-degree murder or any of the degrees of manslaughter. The indictment, of course, charged murder in the first degree, and if the murder was committed in the perpetration of a robbery, which the evidence clearly shows, not only by the testimony of Miss Johnson but by the testimony of the defendant who said that when he opened the car door the first thing he said to the occupants was: "This is a hold-up," it had to be murder in the first degree. (G. S. 1949, 21-401.) Passing that, however, the record discloses that the instructions of the court had been prepared and copies given to counsel, who had them for as long as three hours before the court asked them to make any suggested changes. Counsel for defendant made two suggestions of changes in instructions, and these were made. Counsel for defendant then said:

"Well now possibly you want to request that instruction on murder in the second degree and some degrees of manslaughter as we believe that the evidence, including the alleged confession that has been admitted in evidence, leaves the door open to the effect that the alleged offense could have been committed in the heat of passion and without the intention of taking the life of Mr. David Gray. We base that somewhat on that portion of the alleged confession where he said that he didn't know that the gun was cocked and he intended to cock it and also a statement therein that it was Halloween or near Halloween and he was pulling a prank. And another theory I will advance, Mrs. Hughes in her testimony stated that he asked for the wallet and then when it was thrown toward him he said, 'I don't want the wallet, give me the keys.' I think that that takes out to a certain extent the element of robbery, and in the event that the court agrees that the element of robbery is out of this case, many things could have happened that would justify the court in believing that the deceased met his death in the heat of passion and without any deliberation, malice aforethought or the other essential elements of first degree murder."

Counsel for the state replied:

"If the Court Please, the State's view on that is that under the charge and the instructions given, the defendant is given all the advantage of that by being entitled to an acquittal if the State fails to prove robbery or an attempted robbery beyond a reasonable doubt, and in that event he is acquitted instead of convicted of a lower degree."

The court made a statement in which in the main he concurred with the views of counsel for the state and said:

". . . in this case it is my theory and conviction that under this evidence this jury is limited; if they should convict the defendant, they must believe

beyond a reasonable doubt, first, he was sane; secondly, that he was perpetrating or attempting to perpetrate a robbery; and, thirdly, that he committed a murder in that perpetration or attempt. Otherwise they must acquit, unless, as is also instructed upon, they do find he is guilty beyond a reasonable doubt but also find that he is insane, then they must acquit on the ground of insanity."

Whereupon counsel for defendant said: "I have no more to say about that." The court further interrogated counsel for defendant with regard to the instructions prepared, with the result that counsel for defendant said they had no more suggestions to make.

Counsel for the state in his closing argument referred to what counsel had said in his opening statement to the effect that he would not ask the jury to turn defendant loose, but would ask that he be placed in a place where he would have care and not be able to injure others, and argued that this was a concession that defendant fired the fatal shot. The trial court thought this argument was not seriously objectionable, and we concur in that view.

The record clearly discloses that defendant had a fair trial. The court was particularly careful to see that he did have a fair trial and that no error was committed in any matter of which the appellant now complains.

We have considered the argument of counsel and examined the authorities cited by them, but find no necessity to quote from them. This was, of course, a fact case. The facts have all been determined against defendant by the jury and there is an abundance of evidence to support the verdict. The trial court gave its independent approval. There is nothing in the record which would justify a reversal. The result is the judgment of the trial court must be affirmed.

It is so ordered.