No. 38,646

STATE OF KANSAS, *Appellee*, v. ELBERT PALMER, *Appellant.*

(251 P. 2d 225)

Opinion filed December 6, 1952.

D. *Arthur Walker*, of Arkansas City, argued the cause, and *Norman M. Iverson*, *W. L. Cunningham*, *Wm. E. Cunningham*, and *William R. Howard*, all of Arkansas City, were with him on the briefs for the appellant.

*Lawrence E. Christenson*, County Attorney, of Winfield, argued the cause, and *Harold R. Fatzer*, Attorney General, and *Paul E. Wilson*, Assistant Attorney General, both of Topeka, were with him on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: Elbert Palmer, commonly known as "Babe" Palmer, was duly charged by an information filed in the district court of Cowley county with the crime of murder in the first degree in shooting and killing Robert M. Bradley. Upon a trial the jury found him guilty of murder in the second degree. His motion for a new trial was overruled, the court approved the verdict and sentenced him to fifteen years in the penitentiary. He has appealed and contends the court erred (1) in admitting evidence offered by the state in presenting its case in chief, of voluminous testimony, information, journal entry and verdict of the jury in remote, unrelated convictions of defendant; (2) in refusing to instruct as to lesser offenses of which defendant might have been found guilty under the information and evidence; (3) in failing to have the bailiff sworn as required by G. S. 1949, 20-312 and 62-1448, and in permitting the bailiff to take exhibits to the jury room which were not in evidence; (4) in not sustaining defendant's motion to be discharged, and (5) in not granting defendant a new trial.

Having examined the abstract, counter abstract and briefs of the parties, and also the transcript of more than 500 pages, the pertinent facts, necessarily omitting many details, may be summarized as follows: Robert M. Bradley and Charles Mays had lived in Topeka several years, where they were employed in construction work. Sometime in the summer of 1951, perhaps in July, they went to Winfield, where they got employment at the Binney & Smith plant. They had a room together at 1618 Manning street. Some months prior to going to Winfield Mays had obtained a .22 caliber pistol, the chamber of which held eight shells, which he kept in his grip. Sometime prior to going to Winfield Mays had made the mistake of selling a pint of whisky to a revenue officer and was on parole. On Friday, August 31, 1951, Mays and Bradley quit their jobs in Winfield and drew their pay. Sometime that day Bradley saw the pistol among Mays' belongings and said he had better carry it, for if Mays was found with it, it might cause him trouble with his parole. Bradley took the pistol and stuck it in his belt in front on the left side. He was wearing a sport shirt and the outline of the pistol was readily seen by anyone who observed him. They put in the afternoon and evening, part of the time at some place where they could find liquor, and a part of the time at the Legion hall. Saturday morning they got up late and about noon went to a place at 202 East Fourth street in Winfield known as the "Ben Alberty Place" or "Dave's Place." This seemed to be down near the railroad tracks. There they found people drinking and a dice game going on in the kitchen. The party got noisy and the Reverend Crawford, who lived next door, appears to have complained about it to the police. Bradley was particularly noisy and boisterous; had a quarrel with someone about a seventy-five-cent bet. Mays and Bradley met a Tillie Douglas, who lived at Dave's Place and sometime, perhaps soon after noon, the three of them drove to Arkansas City, where Mays and Bradley expected to get employment, and did so. While there they bought two bottles of whisky of the size known as "fifths." They drove back to Winfield and to their room on Manning street. There they opened one of the bottles and each of them had a few drinks. They went back to Dave's Place, taking one of the bottles of whisky with them. There they were not stingy with the whisky; the bottle was passed around. A number of persons drank and there was testimony that Bradley had three drinks. About 3:30 or 4:00 o'clock in the afternoon the crowd was getting noisy again and the

crap game in the kitchen was broken up. A number of persons were at Dave's Place in the afternoon. Among them were Babe Palmer and his wife's sister, Bernice Thomas. Dave Anderson, who lived at the place, told Babe Palmer that Bradley was carrying a gun and that he was boisterous and rough and a dangerous man. Babe and Bernice went to his home about a block from Dave's Place. Soon thereafter Tillie suggested to Mays and Bradley that they go to Babe's home, which they did. Babe Palmer was not acquainted with Mays and Bradley prior to that day—had never met them and had not invited them to his house. When Mays and Bradley went in the Palmer home Babe Palmer asked them if they wanted to gamble. Mays replied yes, if there were dice. Babe Palmer's house has three rooms on the ground floor and a sleeping room upstairs. It faces to the south. The east room is the living room. There is a door on the south side of the room not far from the southwest corner and a porch along the south side of the house in front of that door. That was the door that was being used as an entrance to the residence. In this living room was a divan along the north side of the room with the east end near the east wall. Sitting a few feet to the south of it was a coffee table. In the southeast portion of the room was a bed sitting at an angle from northwest to southeast. There was a bureau somewhere in the room and also some trunks or lockers and chairs. Directly west of the sitting room is the kitchen. There is a door between the two rooms near the south end of the partition between them. Directly west of the door was a gas cooking stove. There were chairs, a dining table and other furniture in the room. The downstairs bedroom is directly north of the kitchen. When Mays said he would gamble with dice they went in the kitchen, where the dining table had been covered first with papers and then with cloth, apparently fixed for the shooting of dice. Two red dice were on the table. Mays started to shoot dice, said he shot only once, and told Palmer that the dice were crooked. Palmer asked him if he wanted his money back. Mays answered that he would just keep the dice, and put them in his pocket. He said he had lost not more than four dollars. Mays went out into the living room. Bradley stayed in the kitchen. A number of other persons came in, perhaps as many as eight or ten. Most of these were in the kitchen, some of them shooting dice, others standing around watching the game. Bradley was shooting dice. Apparently he took his shirt off and hung it on the back of the chair. He was still carrying the pistol in his belt, which of course was plainly

seen. He was boisterous, talking in a loud voice, and got in a quarrel with someone about a two-dollar bet. He was quoted as saying in a loud voice that he would just as soon kill a man or get killed over two dollars as over a dime. This phrase was quoted somewhat differently by the different witnesses. Palmer was in the kitchen while the quarrel was in progress. Whether he was engaged in it is not clear. There was another quarrel about a torn dollar bill. Apparently Palmer was engaged in that quarrel, for he came through the door into the living room with a part of the torn bill in his hand. Whether that quarrel was with Bradley or someone else is not clear.

About the time Palmer went into the living room from the kitchen the dice game broke up and most of the people in or about the game left. When Palmer came into the room he went over and sat down on the divan or stood and reached down near the northeast corner of the living room. The evidence on that is in conflict. Bradley came out of the kitchen while Mays and Bernice Thomas were standing visiting. Mays testified Bernice was nice looking and that he liked her, although he had met her that day for the first time. Bradley stepped up and said something about Bernice being nice looking and asked if she was married and was informed that she was not. Then Bradley made a remark to the effect that a woman who was as nice looking as Bernice and who was not married there was something wrong with her. There is testimony to the effect that Bernice told Bradley he was making too much noise and there was too much trouble and he had better leave the house, and that Bradley in a loud voice resented that criticism and said that no damned woman could tell him when to leave the house. There was also testimony that instead of using the word "woman" he used the one which reflected on the morality of Bernice, and also that Bradley struck her and knocked her over the coffee table. Mays, testifying for the state, said he did not see that. At that time Palmer came up and told Bradley that he should not treat a woman that way or talk to her that way. Bradley, who had been carrying Mays' .22 revolver since Friday, immediately drew it from under his belt and pointed it at Palmer, and, as testified by Mays, started backing toward the door. Palmer testified that Bradley shot at him and hit him in the left arm. In any event just after Bradley drew his revolver and pointed it at Palmer, Palmer shot Bradley with a .45 caliber army Smith & Wesson revolver. In fact he shot twice, the shots being close together. One shot struck Bradley near the fifth rib on the

right of the sternum, passed under the skin and through the fleshy part of his arm about three inches below the shoulder. The other one struck Bradley about the seventh or eighth rib left of the sternum, passed upward through the fleshy part of the heart and came out at the back about two inches below the top of the shoulder and about three inches to the right of his neck. Powder burns on Bradley, where the bullets entered, indicated that the muzzle of the gun was not more than six inches from his body. Palmer then turned to Mays and threatened him. Mays grabbed Palmer by the wrist, jerked him around, tripped him and threw him on the floor face down, with Mays on top of him. Mays scuffled with him there in order to get his revolver away from him, and succeeded in doing so. During the scuffle the revolver was fired twice, both shots going through the floor. During this scuffle Bradley walked out the south door, across the porch, and some twelve feet in the yard, where he fell dead. When Mays got the revolver from Palmer he ran out the south door, took his own pistol out of Bradley's hand and went away with both pistols. He went to the home of a man whom he had known in Topeka and asked him to keep the revolver until he called for it, and said he and Bradley had been in a shooting scrape. He was located about an hour later and taken into custody. Palmer left his house soon after Mays did and a short distance from there saw officer Dill. He told Dill he had shot a man, and later he said he had killed a man. He asked to be taken to his house, and told the officer to look out for that big black fellow, for he was dangerous, probably referring to Mays. The chief of police was notified and he and other officers searched the premises. The two bullets from the shots fired at Bradley were found in the kitchen, one under the stove, the other on a chair. They made a careful search of the floor of the living room for the two bullets that were fired into the floor and found them in the dirt under the floor. They found no mark on the floor or anywhere in the living room of the .22 bullet which Palmer said had been fired by Bradley. There was other evidence tending to show that the .22 pistol belonging to Mays and carried by Bradley had not been fired. We need not go into a detailed discussion of subsequent events. At the trial Palmer did not deny that he shot Bradley. His contention was that Bradley had attacked him and that he was in fear of his life and shot in self defense.

All the people who were at Dave's Place and those at the Palmer place are colored people. At the beginning of the trial defendant

objected because no colored persons were on the jury and pointed out that in the process of selecting the jury the court had asked the sheriff to pick up talesmen; that some fifteen were selected by the sheriff and that no colored persons were included in the list, and stated there were many colored people in the county qualified to serve as jurors and that none had been selected for that purpose. In answer thereto the court pointed out that no talesmen called by the sheriff served on the jury and that the jury which served was regularly selected from the jury panel.

Upon the trial the state's evidence clearly disclosed that the death of Bradley was caused by one of the shots fired by Palmer. The state offered other evidence much more in detail than above summarized.

The state then called three witnesses, whose testimony may be summarized as follows: Mr. Little, chief of police at Wellington, was permitted to testify that he had a talk with Palmer on October 5, 1946, at Wellington, at which time Palmer stated that he and his wife had gone to Wellington the day before and stopped at the home of a Mr. Johnson; that he gave Johnson a 30-20 Smith and Wesson pistol he had and asked Johnson to keep it until he went home; that in the evening he and his wife were going to the residence of Ethel Lopez to play poker and asked Johnson to let him have the pistol. Johnson gave it to him and he tucked the gun up under his trousers and went to the Lopez place, thinking there might be trouble; that enough people did not come there to play poker and that he and his wife went back to Johnson's. The state also called A. D. Williams as a witness. He was the chief of police at Independence and had held that position about two and one-half years. He was in charge of the records there, and the records showed that on May 19, 1939, the defendant Palmer was arrested for carrying a loaded .38 caliber owl head revolver; that Palmer entered a plea of guilty in the city court and was fined $25 and ordered committed to jail until the fine was paid. He served ten days and was paroled to leave the city by six p. m. of that day; that on June 13, 1939, Palmer was picked up for investigation, his parole revoked, and he served ten days in jail on the original judgment. He had no pistol with him at that time. There is no record that he assaulted anyone, or attempted in any way to use the pistol.

E. P. Bloomer, called as a witness by the state, was permitted to testify that he was county attorney of Cowley county in 1929. The witness had with him the information he had filed September 17,

1929, charging Elbert Palmer with an assault with a deadly weapon upon one Sanchez; also the journal entry of the trial and the verdict of guilty and the sentence to the reformatory. All these papers were offered and received in evidence. All of the testimony of these three witnesses was strenuously objected to by defendant. It was admitted by the court "just for the purpose of showing a motive, intent, habit, inclination, plan and system of operation, and for no other purpose." The court also stated the subject would be covered by proper instructions. The instruction given by the court on that point reads as follows:

"In the course of the trial of this case the state has introduced evidence of prior similar convictions of the defendant. This evidence has been admitted by the court with the admonition that such evidence is limited to a consideration by the jury as tending to show motive, intent, habit, inclination, plan and system of operation."

Defendant duly objected to this instruction, and particularly to the use of the words "similar conviction."

We think defendant's objection to receiving the testimony of the three witnesses last above mentioned, and his criticism of the instruction, were well taken. The gist of the question being tried in this case was whether Palmer, when he fired the shot which killed Bradley, did so in self defense. No similar issue was involved in any of the cases testified to by the three witnesses last named. The pertinent general rule is stated in 22 C. J. S. 1084 as follows:

"The general rule is that evidence that accused has committed another crime independent of, and unconnected with, the one on trial is inadmissible; it is not competent to prove one crime by proving another."

We have said in *State v. Frizzell,* 132 Kan. 261, 295 Pac. 658:

"The rule against the admissibility of evidence of other similar but independent offenses should always be strictly enforced, . . ."

We did enforce it in the late cases of *State v. Owen,* 162 Kan. 255, 176 P. 2d 564, and in *State v. Winchester,* 166 Kan. 512, at pages 514 and 515, 203 P. 2d 229, as we had done in earlier cases. There are exceptions to the rule which are treated in 22 C. J. S. on the pages following the one from which we quoted. Our own cases dealing with the rule and recognized exceptions thereto are digested in Hatcher's Kansas Digest, Rev. Ed., under Criminal Law, §§ 267 to 271. We find no necessity of citing or attempting to analyze all these cases. We think the evidence of the three witnesses above mentioned should not have been received and that the instruction given by the court was inaccurately worded.

Counsel for appellant contend the court erred in refusing to instruct on lower degrees of homicide. Having carefully examined the record we think the point is well taken and that an instruction might well have been given on second degree manslaughter under G. S. 1949, 21-411, which reads:

"The killing of a human being without a design to effect death, in the heat of passion, but in a cruel and unusual manner, unless it be committed under such circumstances as to constitute excusable or justifiable homicide, shall be deemed manslaughter in the second degree."

And under G. S. 1949, 21-412, which reads:

"Every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or do any other unlawful act, after such attempt shall have failed, shall be deemed guilty of manslaughter in the second degree."

And certainly we think an instruction should have been given on manslaughter in the third degree under G. S. 1949, 21-413, which reads:

"The killing of another in the heat of passion, without design to effect death, by a dangerous weapon, in any case except wherein the killing of another was justifiable or excusable, shall be deemed manslaughter in the third degree."

In *State v. Fouts,* 169 Kan. 686, 221 P. 2d 841, the court held:

"In prosecutions for homicide it is the duty of the trial court to instruct the jury, not only as to the offense charged but as to all lesser offenses of which the accused might be found guilty under the information and upon the evidence adduced, even though instructions have not been requested or have been objected to."

The statute and some of our former decisions are set out in the opinion (pp. 692, 693).

In *State v. Germany,* 173 Kan. 214, 245 P. 2d 981, where defendant was charged and found guilty of murder in the first degree, and it was contended (p. 225) that the court erred in not instructing on second degree murder or any of the degrees of manslaughter, we pointed out that the evidence clearly disclosed that the murder was committed in the perpetration of a robbery and had to be murder in the first degree under our statute (G. S. 1949, 21-401). The doctrine of that case is not applicable here.

Should it be contended that the testimony of the state in this case did not require the submission of an instruction upon lesser degrees of homicide, a question which we do not determine, certainly it cannot be said that the defendant's testimony does not require the submission of instructions on the appropriate degrees of

manslaughter. He was entitled to have his theory of the case submitted to the jury.

Counsel for appellant next contend the court erred in failing to have the bailiff sworn, as required by G. S. 1949, 20-312 and 62-1448, and in permitting the bailiff to take exhibits to the jury room which were not in evidence. The pertinent statutes may be summarized or quoted as follows: Section 20-312 authorizes the judges of district courts to appoint a bailiff to serve at the pleasure of the judge, and generally outlines the bailiff's duties, and further reads:

"In every case in which a bailiff is placed in charge of a jury during its deliberations, such bailiff shall, before entering upon the discharge of such duty, take and subscribe to an oath to support the constitution of the United States and the constitution of the state of Kansas, to faithfully perform the duties of bailiff of such court in charge of the jury in the case upon trial, to keep such jury together in some safe, convenient and proper place without food except such as the court shall order, and not to permit any person to speak or communicate with such jury in any way, or to do so himself unless ordered by the court, except to inquire if they have agreed upon a verdict, nor communicate to anyone the state of the deliberations of such jury, and to return said jury into court when so ordered by the court."

Section 62-1448, which is a section of our statutes pertaining to criminal procedure, reads:

"After hearing the charge, the jury may either decide in the court, or retire for deliberation. They may retire under the charge of an officer, sworn to keep them together in some private or convenient place, without food except such as the court shall order, and not permit any person to speak or communicate with them, nor do so himself unless by order of the court, or to ask them whether they have agreed upon their verdict, and return them into court, or when ordered by the court. The officer shall not communicate to any person the state of their deliberations."

From the record before us it is clear that neither of these statutes was complied with. In *State v. McCormick*, 57 Kan. 440, 46 Pac. 777, a similar situation existed and it was held:

"*Held,* that the administration of the oath is an important step in the prosecution, and being specifically required should not be disregarded."

In *State v. Crilly*, 69 Kan. 802, 77 Pac. 701, where the statute had been disregarded, the court held:

"A new trial will not be granted in a criminal action on account of the failure to have the bailiff sworn before his taking charge of the jury, where it appears that the defendant's attorney was cognizant of the omission and made no objection at the time, and that the bailiff properly performed the duties that would have been imposed by the statutory oath."

In this case the attorney for appellant was not in the court room

at the time the jury was sent out to consider the case. He had a long distance call and was at the telephone. The defendant was present and apparently made no objections to the failure of the court to administer the oath to the bailiff. At the argument on this point the record shows the following:

"By the Court: 'I want to state for the record that this county and the courthouse have no provisions for housing and feeding juries.'"

Which is perhaps an explanation of why the oath was not administered. This does not appear to us as being a very good reason. It is the duty of the county to furnish a place for the court to transact its business. (G. S. 1949, 19-104). The place furnished should be sufficient to enable the court to conduct its business in harmony with law.

In this connection appellant complains of the conduct of the bailiff. It appears that the foreman of the jury advised him that the jury would like to have the testimony of a certain witness read to them and were informed by the bailiff that it would take two or three hours to read the testimony, whereupon the jury said they would get along without it. Possibly the bailiff reported that request to the court and was directed by the court to advise the jury as he did. Either way it was done we think it was improper. At any time a jury feels the need of hearing testimony read the request should not be refused because of the time it would take to read the testimony.

A further complaint is made of the conduct of the bailiff in that when the jury asked for the exhibits a document marked by the reporter only for identification and not offered or received in evidence was taken to the jury. What effect, if any, this had upon the jury's deliberations is, of course, speculative, but it was an incident that cannot be condoned.

Counsel for appellant next contend that the court erred in not discharging the defendant. In this connection it is pointed out that Charles Mays was the only witness for the state who testified to the actual shooting, and it is contended that his testimony is positively contradicted by the physical facts, invoking the rule stated in *Fisher v. Central Surety & Ins. Corp.*, 149 Kan. 38, 41, 86 P. 2d 583, and others of like import, to the effect that where the testimony of a witness is positively contradicted by the physical facts neither the court nor the jury is permitted to give credit to such testimony. This argument is predicated on an analysis of the testimony of Mays

as to just where Bradley was standing and just where Palmer was at the time the fatal shots were fired, together with the fact that the bullets were located in the kitchen, west of the living room, where the shooting took place. We have re-examined the testimony of Mays and also the testimony of Palmer and find that neither of them was certain as to just where the parties were with reference to each other, or the posture of either of them. This point is not well taken.

Appellant contends the court erred in not granting his motion for a new trial, and among other questions argues that his motion to quash the panel of jurors should have been sustained for the reason that no colored people were called as regular jurors, nor by the sheriff when asked to select additional jurors, citing *Patton v. Mississippi*, 332 U. S. 463, 68 S. Ct. 184. As previously noted herein, it appears that no one called by the sheriff as an additional juror served on the jury which tried the case. They were all chosen from the regular panel, and there is no showing that in selecting that regular panel there had been any discrimination because of the race of those selected, hence we do not have before us the question ruled upon in the Patton case.

It is shown by the record that when the chief of police and other officers went to the Palmer home soon after the homicide and were making their search about the premises they opened a trunk or locker in which they found some loaded dice and marked cards, which were offered in evidence. The complaint is that this was done without a search warrant. Cases are cited from the federal courts and from some of the states tending to establish the fact that a search warrant would have been needed. We think that is not the rule in this state. (See, *State v. Johnson*, 116 Kan. 58, 66, 226 Pac. 245.)

Counsel also call attention to his objections to several of the instructions given by the court. While some of the instructions are open to the objections made to them we think they are of such a character as are not likely to occur again, and for that reason we shall not take time to go through them seriatim. Questions previously discussed herein were also urged upon the court. For the reasons hereinbefore stated we think the new trial should have been granted.

The judgment of the trial court is reversed with directions to grant a new trial.

PARKER, J., dissents from subdivisions 1 and 3 of the syllabus and the corresponding portions of the opinion.

PRICE, J., dissents from subdivision 1 of the syllabus and the corresponding portion of the opinion.

WEDELL, J. (concurring in part and dissenting in part): This court is granting a new trial for the reasons stated in its opinion. Our criminal code, G. S. 1949, 62-1718 provides:

"On an appeal, the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties."

Under this statute are collected a large variety of cases well known to the bench and bar in which this court has applied the above statute with far greater liberality to effectuate its true intent and purpose than it has on some matters involved in the instant case. (See cases referred to above.)

I fully agree with the majority the jury was entitled to whatever testimony it desired to re-examine during its deliberations irrespective of how much time might be consumed thereby. It was reversible error for the court not to grant the jury's request. I, however, find no support in the record that the bailiff denied the jury's request without first consulting the court and, therefore, I attach no misconduct to the bailiff's action in this regard.

Touching the subject of failure to instruct on the subject of lower degrees of homicide it appears to me that in the light of defendant's own testimony and his claim he killed Bradley only in self defense, he was guilty of murder or nothing. However, in my opinion, our decisions on that point are not in complete harmony. I, therefore, shall not say there is no authority for this court's present decision on that point.

I would not reverse the trial court by reason of its refusal to grant a new trial for failure of the bailiff to take and subscribe to an oath just before the jury retired for its deliberations, as required by G. S. 1949, 20-312; 62-1448. No reasonable person will seriously contend an oath required by law is unimportant and should be disregarded. The question now, however, is whether defendant is entitled to a new trial by reason of an omission of the oath. *On the record presented to this court* I do not think so. My decision is not based upon the fact the Cowley county courthouse had no facilities for housing and feeding the jurors and keeping them together, although I shall comment briefly on that matter later. My position is that *on the basis of the record presented here* defendant is in no position to complain and should not be permitted to unseat the verdict now.

A party cannot sit silently by and take the chances of acquittal, without the required oath having been taken, and subsequently, when convicted, insist on a new trial because the oath was omitted. This court has squarely, and, in my opinion properly, so stated. (See *State v. Crilly*, 69 Kan. 802, 809, 77 Pac. 701, and cases therein cited.)

It is conceded defendant was represented by more than one attorney. On the hearing of the motion for a new trial one of defendant's attorneys presented an affidavit in which he stated neither of defendant's counsel was in the court room when the court sent the jury out to deliberate and they did not learn of the omission of the oath until after the jury was discharged. Counsel for the state categorically deny before this court that defendant's attorneys were absent from the court room at that time. The trial judge, of course, was present in the court room. I shall not say he did not know what attorneys were present. The trial court heard this argument on considering defendant's motion for a new trial. It denied the motion. In my opinion this court should not on appellate review reverse the decision of the trial court by resolving this factual dispute between counsel for the parties as it is doing by saying:

"In this case the attorney for appellant was not in the court room at the time the jury was sent out to consider the case." (p. 568.)

We have properly said this court will not do that. (*State v. Gillen*, 151 Kan. 359, 364, 99 P. 2d 832.) Furthermore, in *State v. Crilly*, supra, this court quoted with approval from an Illinois case, and said:

"'The requirement of the statute that the jury in a criminal case shall be placed in charge of a *sworn* officer upon retirement is waived by the failure of the accused to object at the time to the omission of the oath, and the question is thereafter not open to review upon writ of error, although the point is urged as a ground for new trial by motion supported by affidavits.'" (p. 809.)

In addition to the foregoing I cannot escape the conclusion it constitutes a most dangerous rule which permits all the attorneys for a client to absent themselves from court proceedings, without leave of court, and thereafter permits them to upset the verdict of a jury solemnly reached on the ground none of them was present to object to what transpired during their voluntary and unexcused absence.

I quite readily agree it is the duty of the county to furnish a place for the court to conduct its business in harmony with law. I also agree that lack of adequate facilities in the courthouse to provide

for housing and feeding jurors or inability to comply with other statutory provisions does not constitute a legal excuse for omitting the bailiff's oath. However, every experienced lawyer knows many courthouses in this state are not adequately equipped to comply strictly with all the requirements of the statutes in question. This is particularly true where a jury consists of both men and women, as many of them now do. All I desire to say presently on this particular point is that I am unwilling to upset verdicts where the statutory requirement concerning the housing and feeding of jurors, or some other similar statutory requirement, has not been complied with strictly, absent some circumstance reasonably tending to show the defendant or the state, for that reason, has not had a fair trial. Any other rule would invalidate literally hundreds of verdicts previously rendered and others to be rendered. I find nothing in this record to indicate that failure of the bailiff to take the oath or that any conduct on his part in any manner prejudiced defendant's rights. Under all the circumstances stated I would not grant a new trial by reason of omission of the oath.

Defendant's counsel complain of the conduct of the bailiff in delivering an identified but unadmitted exhibit to the jury in response to the jury's request for exhibits in the lawsuit. Manifestly, the jury should have access only to exhibits admitted in evidence. But surely it is not the bailiff's legal duty and responsibility to decide which identified exhibits have been admitted and which ones have not. On the basis of the record presented here I cannot possibly fasten misconduct on the bailiff for that incident. This was defendant's exhibit. It was identified by his own counsel but for some reason, not here apparent, was not later offered in evidence by the defendant. Furthermore in what manner it prejudiced the jury has not been shown. (See G. S. 1949, 62-1718, previously quoted.)

This brings me to the subject involving admissibility of evidence tending to show characteristics, mental attitude, tendencies, inclinations, motive, intent, etc., of a defendant to commit an act for which he presently stands charged. I need not repeat the three transactions set forth in the court's opinion concerning which evidence was admitted. There is strong authority that each of the transactions was competent in cases of this particular character for the single specific purpose of disclosing defendant's dangerous disposition, tendencies, inclinations, etc., as reflected by consistently and over a

period of many years carrying concealed weapons contrary to law but I shall not labor that point as to each of the separate transactions for reasons which will appear later.

I pause, however, to call attention to the particular offense for which defendant previously was convicted, namely, the offense of assault on another with a deadly weapon, a pistol, "with intent to kill." In my opinion that evidence was entirely competent for the restricted purpose under which it was admitted. The trial court was most solicitous in stating the sole purpose for which this evidence was admissible. The court repeatedly admonished the jury during the course of the trial concerning the limited purpose for which evidence of any of the three transactions could be considered. The first two transactions heretofore mentioned had occurred more recently than the one now under consideration. This one occurred twenty-two years ago. Concerning it the court advised the jury when evidence of that conviction was introduced, as follows:

"Court: I will let it go in, with the warning to the jury, that they are the judges of the weight and credibility of this evidence. It will be admitted *just for the purpose* of showing a motive, intent, habit, inclination, plan and system of operation, *and for no other purpose, and you are the judges of its weight and credibility.*" (My emphasis.)

The evidence for such limited purpose has been admitted in this state in almost every kind of crime imaginable. See a partial list of such cases collected in the dissenting opinion in *State v. Owen*, 162 Kan. 255, 264-265, 176 P. 2d 564. In the Owen case the similar offense was committed twenty-eight years previously but there was no evidence of similar transactions thereafter until the one for which he was being tried. It is argued that opinion has been construed generally by the bench and bar to mean the similar offense was *too remote* to have probative value. I think that is a fair interpretation of the majority opinion although on that basis it is in conflict with a long line of consistent decisions of this court. And in a later well written opinion by Justice Robert T. Price this court returned to its previous rule on the subject of remoteness and held:

"The general rule is that evidence that a defendant in a criminal prosecution has committed another crime independent of, and unconnected with, the offense for which he is being tried, is inadmissible.

"There are several well-recognized exceptions to the foregoing general rule— one of them being that where guilty knowledge is in issue, or an element of the crime charged, evidence of the prior commission of similar offenses by defendant is admissible to prove such knowledge.

"Remoteness in time of such evidence, otherwise admissible, *affects the weight and probative value and not the admissibility of the evidence*." (*State v. Fannan,* 167 Kan. 723, Syl. ¶ 1, 2, 3, 207 P. 2d 1176.) (My emphasis.)

The case of *State v. Winchester,* 166 Kan. 512, 203 P. 2d 229, cited in the court's opinion, is not, in my judgment controlling or in point with respect to the admissibility of evidence of former convictions or of similar offenses. The question there pertained to a mere colloquy largely between the chief of police and the county attorney and was properly held to be inadmissible. (See p. 515.)

It has been observed the rule in *State v. Fannan,* supra, previously quoted, is properly limited to offenses "otherwise admissible." Why was the evidence of defendant's conviction of assault on another with a deadly weapon and "with intent to kill" not admissible in the present case? In the court's opinion it is said:

"The gist of the question being tried in this case was whether Palmer, when he fired the shot which killed Bradley, did so in self defense. *No similar issue was involved in any of the cases testified to by the three witnesses last named.*" (p. 575.) (My emphasis.)

With utmost respect to my colleagues I have not found facts in the record to support the italicized statement. However, assuming its correctness, surely the statement cannot constitute a proper test concerning the admissibility of evidence involving previous similar offenses. In a previous case a defendant might have denied he committed the offense or he might have alleged the killing was a mere accident or he might have asserted some other defense such as an alibi. It does not follow facts in the previous offense could not clearly throw light on defendant's mental attitude, tendencies, inclination, motive, intent, etc., to commit the offense for which he is presently on trial and in which he claims he killed solely in self defense. It is unnecessary to pursue this point. A sufficient answer, in my opinion, to the test laid down by the court in the instant case is that the rule here involved is not limited to offenses for which there has been a conviction. It repeatedly has been invoked as to other similar offenses on which there had been no trial and in which it, therefore, was impossible to know what the defense might be.

It also is noteworthy that G. S. 1949, 62-1449 recognizes the admissibility of evidence of other offenses *on which there has been no trial* and which could have been, but were not, joined in the same information by providing, in substance, that if evidence concerning them is offered against a defendant in the case being tried prosecu-

tion on such other offenses shall thereafter be barred. (*State v. Momb*, 154 Kan. 435, 119 P. 2d 544.)

Is evidence of similar offenses properly admitted in a state's case in chief? Concerning that question there can be only one answer under our decisions. In *State v. Robinson*, 125 Kan. 365, 263 Pac. 1081, a 1928 embezzlement case, in the trial of which the author of the instant opinion participated, the state gave notice in its opening statement that in addition to five counts pleaded it would show other transactions, not convictions, of similar character. Such evidence was later introduced in the state's case in chief over defendant's objection but with proper admonition of the trial court to the jury respecting the limited purpose for which it was admitted. This court held the evidence was properly introduced in the state's case in chief. Earlier and many later cases are to the same effect. Obviously the state must prove all elements of an offense in its case in chief or its proof fails. Evidence of intent, with a few exceptions not here involved, is one of them. If the state should wait to introduce evidence of numerous similar offenses until after a defendant has rested his case the defendant might well have a just complaint on the ground such evidence was not proper rebuttal but testimony which should have been offered in the state's case in chief.

The state makes a contention which I cannot ignore. Its counter abstract discloses defendant took the witness stand and admitted he committed the three offenses previously discussed and others. It early and consistently has been held by this court that where incompetent testimony is given to the jury, such error is cured where a defendant on his own behalf testifies substantially to the same facts erroneously admitted in the first instance. (*State v. Furney*, 41 Kan. 115, 21 Pac. 213; *State, ex rel., v. Strevey*, 138 Kan. 646, 27 P. 2d 253; *In re Estate of Langdon*, 165 Kan. 267, 273, 195 P. 2d 317.) Our rule is in harmony with the generally accepted doctrine that, "Admission of improper evidence which relates to a fact which is admitted, conceded, uncontroverted, or placed beyond dispute by uncontradicted evidence is harmless error." (5 C. J. S., Appeal and Error, § 1732a.)

In passing it also may be observed this is not a case in which the defendant might have chosen not to testify in his own behalf had it not been for the admission of the alleged incompetent testimony. The state had shown the defendant had killed Bradley. Defendant admitted that fact but claimed he had done so only in self defense. He, therefore, was obliged to take the witness stand in order to

establish that defense irrespective of the admission of alleged incompetent testimony. Having adopted an affirmative defense which required him to be a witness in his own behalf he subjected himself to cross examination concerning prior offenses not embraced in his direct examination and concerning subjects involving him in degradation and disgrace, although not pertaining to the charge for which he was on trial. (*State v. Pfeifer*, 143 Kan. 536, 56 P. 2d 442; *City of Wichita v. Hibbs*, 158 Kan. 185, 188-189, 146 P. 2d 397; *State v. Osborn*, 171 Kan. 330, 333, 232 P. 2d 451.) Defendant having admitted the three offenses it follows he cannot now insist upon a new trial by reason of the evidence the state introduced concerning them.

I shall not unduly labor defendant's contention the court erred in its instruction to the jury set forth in the court's opinion which referred to prior "similar convictions." There was only one conviction of a strictly similar offense. With respect to it I would not say the instruction constituted reversible error. It is true defendant also admitted the other two convictions and the court was required to instruct concerning them. It, however, was inaccurate and improper to refer to all of the convictions as "similar convictions." The other two convictions or offenses should have been covered by a separate and appropriate instruction.