No. 91,406

STATE OF KANSAS, *Appellee,* v. KEVIN W. GUNBY, *Appellant.*

144 P.3d 647

Opinion filed October 27, 2006.

*Michelle A. Davis,* assistant appellate defender, argued the cause and was on the brief for appellant.

*W. Scott Toth,* assistant district attorney, argued the cause, and *Steven J. Obermeier,* assistant district attorney, *Paul J. Morrison,* district attorney, and *Phill Kline,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Kevin W. Gunby appeals his conviction and sentence in this premeditated first-degree murder case arising out of the strangulation death of his high school classmate, Amanda Rae Sharp.

Gunby raises four questions for this court's consideration: (1) Did the district court err in admitting evidence of prior violence between Gunby and Sharp? (2) Did the prosecutor commit reversible misconduct during closing argument? (3) Did the PIK Crim. 3d instruction on lesser included offenses and argument emphasizing it nullify the presumption of innocence in K.S.A. 21-3109? and (4) Does cumulative trial error require reversal of defendant's conviction?

The pertinent facts are these: Brad Jaynes, a senior at Shawnee Mission North High School, attended school with Gunby. When Jaynes' family moved out of the school district, Jaynes began living with the Gunby family so that Jaynes could finish high school where he had started it.

On the day of the crime, Gunby and Jaynes went to school together in Gunby's car. There they met with friends, including Sharp and Jackie Erwin. Gunby asked Sharp to come over to his house sometime that day, and the two left together before school started at 7:45 a.m. The pair would often skip school together and go to Gunby's house, where they smoked marijuana and occasionally had sex.

At 9 a.m., Jaynes and Erwin also left school to go to the Gunby house. Erwin called Gunby as she drove, and Gunby told her not to come over. They argued, and she hung up on him. She then dropped Jaynes off at the Gunby house about 9:20 a.m.

When Jaynes arrived, Gunby met him at the door. Gunby looked sweaty and agitated; he had a cut over his right eye and bite marks on his shoulder.

"Guess what I did?" Gunby said. "[Y]ou know how I talked about killing [Sharp]? Well, I did it."

After this revelation, Jaynes observed Sharp lying face down on a bed in a downstairs bedroom. Blood was coming from her nose,

and she was pale and limp. Jaynes unsuccessfully tried to find Sharp's pulse.

Gunby told Jaynes that he and Sharp had gotten into an argument about sexual activity they had engaged in earlier. Gunby said he had gotten rough with her and started throwing her around. Sharp had said she was going to have her boyfriend, Nick Adriano, kill Gunby. At that point, Gunby said, he choked Sharp for about 10 minutes. Sharp, Gunby told Jaynes, "put up a pretty good fight." Jaynes also testified ultimately that Gunby kept repeating that he was "fucked" and did not know what he was going to do. Gunby nevertheless said he planned to take Sharp's body to Nall Park and dump it in the creek to "get the DNA off of the fingernails."

At this point, Jaynes borrowed Gunby's car to go get cigarettes. When he returned to the house, he found Gunby gesturing for him to back the car into the garage. Gunby then wrapped Sharp's body in blankets and tried unsuccessfully to move her. At Gunby's request, Jaynes helped Gunby move the body to the garage, where Gunby placed it in the trunk of his car.

Gunby also asked Jaynes to help clean blood off a concrete wall. Gunby then repainted the wall and told Jaynes: "You'd better watch your back."

After eating lunch, Gunby gave Jaynes a ride to a friend's house. Before leaving, Gunby went through Sharp's purse, found an identification card, stroked it, and said he was going to keep it to remember her by. When he dropped Jaynes off at the friend's house, Gunby told Jaynes to think "happy thoughts" and not to mention anything about Sharp's death to anyone.

Jaynes did exactly the opposite. He told the friend about Sharp's death and walked with the friend to Shawnee Mission West (West), where he met his girlfriend.

The girlfriend testified that Jaynes was crying when he met her at West. He told her that Sharp was dead and that Gunby had strangled her. The girlfriend then called her mother, who told the teens to report the crime to a person in authority.

Jaynes and his girlfriend approached Officer Robert Miller, the school resource officer at West. Both were crying, and Miller could not understand them immediately. The girlfriend still had her

mother on a cell phone, and the mother told Miller that the two teens were witnesses to a homicide. Miller then interviewed Jaynes and his girlfriend.

Detective Scott Atwell was assigned to investigate. He interviewed Jaynes at the police station at 4 p.m. on the day of the crime and again 2 days later. Jaynes' two recitations of events were essentially the same, although he acknowledged during the second that his first account had omitted his trip to get cigarettes after seeing Sharp's body.

Detective Gary Borstelman was assigned to conduct surveillance at the Gunby house, with instructions to detain Gunby if he attempted to leave. At about 6:30 p.m. on the day of the crime, Gunby came out of the house and walked toward his car. Borstelman approached Gunby and identified himself and ordered Gunby to take his hands out of his pockets and step to the rear of the car. Seeing people in the house looking out the window, Gunby said: "Please don't let my mother know why you are here," and, on the way to the squad car, "You almost missed me. I was getting ready to leave."

Detective Kent Leiker secured Gunby's car after he was arrested, and Sharp's body was discovered in the trunk. The body had been wrapped in multiple layers of bedding with duct tape secured at the ankles, upper torso, and around the head. Sharp's jeans and underwear had been pulled down to just above her knees. At the time her body was found, Sharp was clothed in a leather collar, about 1.5 inches wide and .25 inches thick, with eight spikes. The collar had been set in the tightest position, which left it with some slack. Sharp also was wearing a chain around her neck, twisted at one end and double-wrapped underneath the collar, and a black leather belt or harness, secured just above her hips with nylon straps that clipped on in the front and the back.

Forensic neuropathologist Michael Handler performed an autopsy on Sharp's body the next day, observing evidence of homicidal strangulation. Petechial hemorrhages indicated a prolonged struggle with on-and-off ligature. There also were abrasions corresponding with the upper edge of the collar on Sharp's neck, which extended horizontally over the sides of the neck, consistent

with a homicidal strangulation involving a ligature. In addition, multiple injuries in several layers of Sharp's neck muscles, including two large hemorrhages, indicated manual strangulation. Handler opined that the collar had been shoved up, abrading Sharp's skin, and that the pressure for manual strangulation was applied just below the collar on her neck.

Handler also testified that it appeared Sharp had struggled with her killer, that there was considerable force applied, and that the strangulation was prolonged. When strangling pressure is applied, he said, a victim loses consciousness within seconds, and brain tissue starts to die within 6 minutes. However, pressure must be continuous for at least 8 and possibly 12 minutes or longer after the victim loses consciousness for vital parts of the brain to die. Sharp's injuries, he said, were consistent with the application of constant pressure to her neck for a period of 10 minutes.

Handler also testified that he had seen two to three cases per year of accidental asphyxiation when ligature had been used during sex. He said the collar and the belt on Sharp's body were typical of items worn by participants in sexual asphyxiation cases.

Handler also observed blunt force trauma to Sharp's forehead, the back of her head, and the temporalis muscle, which moves the jaw. The first of these injuries was consistent with Sharp's head hitting a concrete wall, causing bleeding between the scalp and the skull.

About 2 years before the crime, Gunby and Sharp had run away together for a week before they were found by authorities in California and sent back home. Gunby's parents did not approve of Sharp, nor hers of him. Yet Gunby continued to provide material things for Sharp, and the two continued to engage in sexual activity.

Sharp also had a boyfriend, Adriano, in the months leading up to her death. Gunby was jealous about this relationship and would get angry with Sharp. Jaynes testified that Gunby called Sharp a "slut" and "whore" and said on numerous occasions that he wished he could kill her. In addition, Gunby had admitted to Jaynes that he had gotten rough with Sharp about 2 weeks before her death.

Adriano testified that Sharp had told him Gunby called him a "bum" and urged her to break up with him. He also testified that

he and Sharp had a sexual relationship and that she had refused to allow him to tie her up.

Over objection, Adriano also repeated a story Sharp had related about a violent incident between her and Gunby a month before her death. Sharp told Adriano that she and Gunby had been hanging out and smoking marijuana at Gunby's house. When she was getting ready to leave, Gunby smirked and pushed her onto a bed, where he jumped on her and handcuffed her wrist to a bedpost. After she struggled with him for several minutes, Gunby began choking her, which he continued to do for a minute or two. After he let go, she said, he was afraid she was going to tell someone. When Sharp relayed this story, Adriano said, she was crying and had visible injuries on her wrist.

Sharp's best friend, Zoisha Malin, also testified over objection that Sharp had told her a couple of weeks before the murder that Sharp "was frightened because [Gunby] had talked her into doing another sexual favor . . ., and had tied her to a bed but would not listen to her. She was afraid he was going to molest her or do otherwise." It is unclear from the record on appeal whether the incidents between Sharp and Gunby before Sharp's death about which Adriano and Malin testified were the same occurrence or two occurrences.

Malin also testified about Sharp's sexual relationship with Adriano. According to her, Adriano had told her he choked Sharp during sex on one occasion. Malin said Sharp had told her she did not like it.

The district judge instructed Gunby's jury that, if its members "[did] not agree" Gunby was guilty of premeditated first-degree murder, "[they] should then consider" lesser included offenses. In his closing argument, the prosecutor said Kansas law provided for jury review of potential crimes of conviction from "top-to-bottom," *i.e.*, the jury should make its decision on whether Gunby was guilty of premeditated first-degree murder before it moved on to consideration of any lesser crime. "[I]f you all agree that the defendant is guilty of premeditated first-degree murder, then you are not to consider any of these other lesser-included crimes," he said. "Once you find first-degree premeditated murder, you are not to consider

these other instructions. . . . They are given to you only if you think that we failed to meet our burden."

The prosecutor also said during his closing argument:

"I'm telling you based on the definition given to you by the court, premeditation can occur after the chain of events start[s]. . . .

"It can mean that any point when the chain of events starts, if the defendant thinks beforehand and there is some thought put into the fact that 'I want to kill her,' that meets the definition of premeditation.

"It could very well mean that at some point after he started hitting her and strangling her that he made the conscious decision, 'I want to kill you.' When that goes through his mind, that's when he premeditates.

. . . .

"[T]his case is based on sound science, and the science of murder is this; you cannot intentionally strangle somebody to death without there being premeditation. It is the only type of murder that exists where you simply cannot perform it unless you are intending to kill your victim. . . .

". . . When you shoot somebody, the bullet is gone. When you set a house on fire, the fire rumbles. When you beat somebody with a baseball bat, the damage has been done. But if you strangle somebody, if you don't want that person to die, you let go and they will revive.

"It is impossible to intentionally strangle somebody to death without knowing, thinking and wanting that person to die. And ladies and gentlemen, that is all that is required for premeditation.

. . . .

"Ladies and gentlemen, that is the premeditation. A person simply cannot apply constant pressure to somebody's neck for a period of a minimum of six minutes, up to 12 minutes, without them [] wanting that person to die."

During its deliberations, the jury requested to hear the testimonies of Adriano and Malin again, and those portions of the transcript were read to the jury in open court.

The jury also sent a question to the district judge regarding the prosecutor's statements about premeditation: "Is it true that premeditation can occur during the act of strangulation?" The judge responded: "It is for you to determine this issue based on the facts as you find them and the law as given in the Court's instructions." Defense counsel had earlier objected to the premeditation instruction given by the court, PIK Crim. 3d 56.04(b), which read:

"Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there

is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

Gunby was convicted of premeditated first-degree murder and sentenced to life imprisonment.

### Admission of Testimony Regarding Prior Violence

The district judge admitted Adriano's and Malin's testimonies about Sharp's stories of a previous violent incident or incidents between her and Gunby as "evidence of a discordant relationship preexisting the incident relating to death." In addition, the district judge said the incident or incidents qualified as "part of the *res gestae* of the situation." Defense counsel had challenged the testimony as unduly prejudicial but had made no hearsay objection.

On appeal, Gunby argues that admission of this testimony was not permissible under K.S.A. 60-455, or, in the alternative, if the evidence was admissible under K.S.A. 60-455, then the district judge erred by failing to give a limiting instruction to the jury. He also argues that one incident is insufficient to demonstrate a course of conduct and that the incident was too remote in time to qualify as res gestae. Finally, he urges this court to abandon its previous rulings permitting admission of other evidence independent of K.S.A. 60-455.

Generally, when considering a challenge to a district judge's admission of evidence, an appellate court must first consider relevance. Unless prohibited by statute, constitutional provision, or court decision, all relevant evidence is admissible. K.S.A. 60-407(f). Evidence is relevant if it has any tendency in reason to prove any material fact. K.S.A. 60-401(b). To establish relevance, there must be some material or logical connection between the asserted facts and the inference or result they are intended to establish. *State v. Lumley*, 266 Kan. 939, 950-51, 976 P.2d 486 (1999).

Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question. *State v. Carter*, 278 Kan. 74, 77, 91 P.3d 1162 (2004). When the adequacy of the *legal* basis of a

district judge's decision on admission or exclusion of evidence is questioned, we review the decision de novo.

### Admissibility of Other Crimes or Civil Wrongs Independent of K.S.A. 60-455

K.S.A. 60-455 provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is *admissible when relevant to prove some other material fact including* motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." (Emphasis added.)

Under the plain and unambiguous language of the statute, evidence of prior crimes or civil wrongs cannot be admitted to prove a criminal defendant's propensity to commit the charged crime, but it can be "admissible when relevant to prove some other material fact." K.S.A. 60-455.

Current case law requires certain safeguards. Before K.S.A. 60-455 evidence can be admitted, the district judge must determine that it is relevant to prove one of the eight material facts listed in the statute, that the material fact is disputed, and that the probative value of the evidence outweighs its potential for producing undue prejudice. See, *e.g.*, *State v. Drennan*, 278 Kan. 704, 716-18, 101 P.3d 1218 (2004). In addition, we have required trial judges to give a limiting instruction informing the jury of the specific purpose for admission whenever K.S.A. 60-455 evidence comes in. See, *e.g.*, *State v. Wilkerson*, 278 Kan. 147, 153, 91 P.3d 1181 (2004). These safeguards are designed to eliminate the danger that the evidence will be considered to prove the defendant's mere propensity to commit the charged crime.

Without these kinds of safeguards, we have recognized that at least three types of prejudice can follow from the admission of other crimes and civil wrongs evidence:

" '. . . First a jury might well exaggerate the value of other crimes as evidence proving that, because the defendant has committed a similar crime before, it might properly be inferred that he committed this one. Secondly, the jury might conclude that the defendant deserves punishment because he is a general wrongdoer

even if the prosecution has not established guilt beyond a reasonable doubt in the prosecution at hand. Thirdly, the jury might conclude that because the defendant is a criminal, the evidence put in on his behalf should not be believed.' " *State v. Davis*, 213 Kan. 54, 58, 515 P.2d 802 (1973).

In this case, the testimony of Adriano and Malin about the previous violent incident or incidents between Sharp and Gunby was relevant to prove motive, intent, and lack of mistake or accident, all material facts listed in the statute. See *State v. Anicker*, 217 Kan. 314, Syl. ¶ 1, 536 P.2d 1355 (1975) (evidence of prior physical mistreatment of wife introduced to show motive and intent); *State v. Patterson*, 200 Kan. 176, Syl. ¶ 2, 434 P.2d 808 (1967) (same). All were directly in issue. Indeed, the challenged testimony ran directly contrary to the defense theory of the case, *i.e.*, that Sharp's death occurred because Gunby was high and the strangulation was an unintentional, unexpected, and accidental artifact of rough sex. Compare *State v. Sexton*, 256 Kan. 344, 350-51, 886 P.2d 811 (1994) (evidence that defendant had engaged in sexual bondage with former wife relevant, admissible to show deliberate, rather than accidental, strangulation of girlfriend). As long as the prejudicial effect of the evidence did not outweigh its probative value, the district judge could have elected to admit the testimony under K.S.A. 60-455. Had he done so, a proper limiting instruction should have been given.

Under these circumstances, Gunby challenges the fairness of permitting the testimony of Adriano and Malin to instead be admitted independent of the statute—thereby avoiding the explicit relevance inquiries, the particularized weighing of probative value and prejudicial effect, and the prophylactic limiting instruction required to admit evidence under K.S.A. 60-455.

Gunby's challenge prompts us to review the development of our jurisprudence on admission of evidence of other crimes and civil wrongs. We conclude that our lines of cases allowing admission of such evidence independent of K.S.A. 60-455 are contrary to long-held common law and the text of the statute itself. The practice of admitting evidence independent of K.S.A. 60-455 also is unnecessary and carries the potential to violate a criminal defendant's fundamental right to a fair trial.

Before the 1963 enactment of K.S.A. 60-455, Kansas cases consistently held: "The well-recognized general rule prevailing in this and other jurisdictions is that evidence is inadmissible to prove that the accused has been convicted of another crime independent of, and unrelated to, the one on trial; it is not competent to prove one crime by proving another." See, *e.g.*, *State v. Myrick*, 181 Kan. 1056, 1058, 317 P.2d 485 (1957).

This general rule was based upon the principle that evidence of an unrelated prior conviction is irrelevant and unduly prejudicial, and this court repeatedly stated that the rule should be strictly enforced. See *Myrick*, 181 Kan. at 1058; see also *State v. Aldrich*, 174 Kan. 335, 337-38, 255 P.2d 1027 (1953) (limiting instruction saves admission); *State v. Palmer*, 173 Kan. 560, 565-66, 251 P.2d 225 (1952) (testimony regarding previous offenses error); *State v. Fannan*, 167 Kan. 723, 726-27, 207 P.2d 1176 (1949) (admission approved in light of limiting instruction); *State v. Winchester*, 166 Kan. 512, 514-16, 203 P.2d 229 (1949) (safeguards required to admit evidence of other offenses); *State v. Owen*, 162 Kan. 255, 260, 176 P.2d 564 (1947) (admission of earlier conviction for murder error); *State v. Frizzell*, 132 Kan. 261, 267, 295 Pac. 658 (1931) (evidence of similar offense admissible; associate's involvement in other crimes not admissible); *State v. Wheeler*, 89 Kan. 160, 165-66, 130 Pac. 656 (1913) (evidence of relationship to other criminals ought not to have been received); *State v. Reed*, 53 Kan. 767, 774, 37 Pac. 174 (1894) (evidence of "criminal intimacy" with wife of murder victim relevant to motive; limitations appropriate).

Nevertheless, several distinct exceptions to the general rule developed at common law, exceptions "permitted from absolute necessity." *Myrick*, 181 Kan. at 1058. Evidence of an independent crime was admissible in the State's case in chief in the discretion of the court, under proper instructions, if relevant to prove identity of person or crime; scienter or guilty knowledge; intent; inclination or motive; plan, scheme, or system of operation; or malice. Such evidence also was admissible to rebut special defenses. *Myrick*, 181 Kan. at 1058-59; see *Owen*, 162 Kan. at 259 (evidence may be admissible to show identity, scienter or guilty knowledge, intent, motive, system, malice, or to rebut defense); *State v. Grey*, 154

Kan. 442, 444-45, 119 P.2d 468 (1941) (plan); *State v. Gwynne*, 142 Kan. 13, 15, 45 P.2d 849 (1935) (robbery of second bank in vicinity); *State v. Caldwell*, 131 Kan. 622, 624, 293 Pac. 389 (1930) (evidence of defendant's knowledge); *State v. Turner*, 128 Kan. 376, 377, 278 Pac. 58 (1929) (evidence of previous similar liquor offense); *State v. Reuter*, 126 Kan. 565, 567, 268 Pac. 845 (1928) (evidence may be appropriate to show identity, scienter, lack of mistake, plan); *State v. Robinson*, 125 Kan. 365, 367-68, 263 Pac. 1081 (1928) (knowledge, intent, method, absence of mistake); *State v. Stanley*, 123 Kan. 113, 115-16, 254 Pac. 314 (1927) (guilty knowledge); *State v. King*, 111 Kan. 140, 142-50, 206 Pac. 883 (1922) (collecting citations, permitting other crimes evidence to prove identity).

In particular, from at least 1893 on, Kansas courts admitted evidence of a discordant marital relationship when one spouse stood accused of killing the other. See *State v. O'Neil*, 51 Kan. 651, 665, 33 Pac. 287 (1893); see also *State v. Rupe*, 226 Kan. 474, 477-78, 601 P.2d 675 (1979); *State v. Scott*, 117 Kan. 303, 319, 235 Pac. 380 (1924), *aff'd on rehearing* 118 Kan. 464, 235 Pac. 380 (1925); *State v. Cruse*, 112 Kan. 486, 494, 212 Pac. 81 (1923). In the 1893 case, the court specifically wrote: "Ill treatment and previous assaults by husband on wife are admissible to prove *motive*, in cases of marital homicide." *O'Neil*, 51 Kan. 651, Syl. ¶ 2. (Emphasis added.)

Still, the prejudicial effect of other crimes and civil wrongs evidence remained a concern when any exception to the general rule of exclusion was invoked at common law, and trial judges were urged to weigh carefully whether the relevance or probative value of the evidence justified the potential for undue prejudice. In addition, juries received appropriate limiting instructions. See *Myrick*, 181 Kan. at 1059.

K.S.A. 60-455 became effective on January 1, 1964. It did not change the common law substantially. See, *e.g.*, *State v. Patchett*, 203 Kan. 642, 643, 455 P.2d 580 (1969); *State v. Wright*, 194 Kan. 271, 274, 398 P.2d 339 (1965). Rather, it codified the historical concept that evidence of other crimes or civil wrongs could be admitted for certain limited purposes.

Several cases soon admitted such evidence when relevant to prove a material fact, if, in the court's discretion, its relevance outweighed its prejudicial effect and the jury was properly instructed. See, *e.g.*, *State v. Jerrel*, 200 Kan. 415, 420-21, 436 P.2d 973 (1968) (attempted larceny of promissory note relevant in prosecution for possession of burglary tools); *State v. Omo*, 199 Kan. 167, 173, 428 P.2d 768 (1967) (grand larceny conviction admissible regarding larceny in connection with burglary); *State v. Darling*, 197 Kan. 471, 475-81, 419 P.2d 836 (1966) (evidence relevant to intent, plan); *State v. Crowe*, 196 Kan. 622, 625-26, 414 P.2d 50 (1966) (preparation, plan illustrated); *State v. Mader*, 196 Kan. 469, 472-73, 412 P.2d 1001 (1966) (evidence demonstrated plan); *State v. Lewis*, 195 Kan. 389, 391-94, 405 P.2d 796 (1965) (identity, intent, plan shown by other crimes); *State v. Wright*, 194 Kan. at 274-76 (identity, other facts set forth in statute at issue in forgery prosecution); *State v. Shannon*, 194 Kan. 258, 262-63, 398 P.2d 344 (1965) (instruction set forth eight statutory facts).

But two problems soon developed in the interpretation and application of the statute.

The genesis of the first was the second case discussing K.S.A. 60-455 after its enactment. In that case, *State v. Wright*, 194 Kan. 271, 398 P.2d 339 (1965), the court's opinion correctly interpreted the new statute and appropriately applied the common-law safeguards. However, a critical part of the court's holding was misstated in one syllabus paragraph, which read:

"In a criminal action the rule against the admissibility of evidence of other similar but independent offenses should always be strictly enforced, and to justify any departure therefrom the evidence *must* come under one or more of the exceptions to the general rule as set forth in the Code of Civil Procedure, Laws 1963, Ch. 303, § 60-455." *Wright*, 194 Kan. 271, Syl. ¶ 1. (Emphasis added.)

This paragraph's conversion of K.S.A. 60-455's list of material facts from exemplary to exclusive was picked up and reified by subsequent cases. These cases incorrectly limited the material facts supporting admission of other crimes and civil wrongs evidence to those eight explicitly set forth in the statute—motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident (see *State v. Jarvis*, 201 Kan. 678, 682, 443 P.2d

272 [1968]; *State v. Motley,* 199 Kan. 335, 337, 430 P.2d 264 [1967])—an interpretation that contradicts the legislature's unambiguous language. The eight material facts set forth in K.S.A. 60-455 are starting points for analysis rather than ending points. Evidence is "admissible when relevant to prove *some other material fact including* motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." (Emphasis added.) In other words, these eight are *among* the possibilities, not the *only* possibilities.

The second problem with interpretation and application of the statute first surfaced in 1968, when this court decided *State v. Roth,* 200 Kan. 677, 438 P.2d 58 (1968). Evidence of defendant Stephen Roth's other similar offenses had been admitted as probative of intent, knowledge, and absence of mistake; but the trial judge failed to instruct the jury on the limited purpose of the admission. Roth, who had not requested a limiting instruction at trial, nevertheless argued on appeal that the failure to give the instruction was prejudicial error requiring reversal. *Roth,* 200 Kan. at 679.

Despite pre-K.S.A. 60-455 holdings to the contrary, see *e.g., Cruse,* 112 Kan. at 482 (erroneous failure to give limiting instruction may, may not demand reversal), this court accepted Roth's argument: "The instruction should have been given. The remaining question is, did the appellant waive the error by failing to request the instruction? We think not *under the circumstances of this case." Roth,* 200 Kan. at 680. (Emphasis added.) The court supported its conclusion by looking to K.S.A. 62-1447 (Corrick 1964), which imposed a "positive duty upon the trial court to fairly present the law of the case on all salient features." *Roth,* 200 Kan. at 680. "[W]hen such evidence is introduced under K.S.A. 60-455 its restriction to the purpose of that section becomes a salient feature in the case and failure to so instruct is error" of "such a prejudicial nature as to require the granting of a new trial." *Roth,* 200 Kan. at 680.

*Roth* laid the groundwork for *State v. Rambo,* 208 Kan. 929, 495 P.2d 101 (1972), which came along 4 years later and eliminated *Roth*'s qualifying language commanding reversal only "under the circumstances" of that case. In *Rambo,* reversal became an automatic and absolute remedy for failure to give a limiting instruction

in K.S.A. 60-455 cases: "The failure to give an instruction limiting the purpose for which evidence of a similar previous offense was to be considered, regardless of request, is of such a prejudicial nature as to require the granting of a new trial." *Rambo*, 208 Kan. at 930.

These two problems with K.S.A. 60-455—interpretation of its list of material facts as exclusive rather than exemplary and the application of an unnecessarily harsh automatic reversal rule for cases in which a limiting instruction was erroneously omitted—set the stage for rapid and enthusiastic development of various avoidance techniques. If one of these techniques was available, there was every incentive for the State to admit evidence independent of K.S.A. 60-455 and thus skirt its attendant safeguards.

The first such technique was used in a case decided the same day as *Rambo*, which blazed a wide trail around K.S.A. 60-455. That case, *State v. Martin*, 208 Kan. 950, 953, 495 P.2d 89 (1972), held that a trial judge's failure to give a limiting instruction about evidence the defendant attacked a neighbor while looking for the victim did *not* require reversal. The evidence, although it "tended to establish" the statutory material facts of "identity, intent and motive; and it negatived mistake," was "independently admissible—and without limiting instructions" because it was "evidence directly relating to the commission of the offense charged . . . tending to directly establish a crime." *Martin*, 208 Kan. at 952-53. The court did not explain why it held in *Rambo* that it was prejudicially erroneous to admit other crimes evidence under K.S.A. 60-455 without a limiting instruction, while it was willing to hold in *Martin* that it was not prejudicially erroneous to admit *the same evidence* independent of K.S.A. 60-455 without a limiting instruction.

This anomaly was set in stone by this court's 1974 decision in *State v. Bly*, 215 Kan. 168, 523 P.2d 397 (1974). In *Bly*, a grocery store aggravated robbery case, the district court judge admitted K.S.A. 60-455 evidence of the defendant's federal conviction for bank robbery as relevant to identity. This court held the admission of the evidence error; the known facts underlying the bank robbery conviction were inadequate to determine whether that crime was

similar enough to the charged crime. The court nevertheless declined to reverse, given the weight of other evidence against the defendant. *Bly*, 215 Kan. at 178-79.

On the way to that outcome, Justice David Prager enunciated 11 "basic principles" for applying K.S.A. 60-455. They included:

"6. Generally in every case where evidence of other crimes is admitted solely under the authority of 60-455 the trial court should give an instruction limiting the purpose for which evidence of the similar offense is to be considered. [Citation omitted.] It should be noted, however, that *where evidence disclosing another criminal offense has a direct bearing on and relation to the commission of the offense itself, it is admissible without a limiting instruction.* [Citation omitted.] Stated in another way, *it is not prejudicially erroneous for the trial court to fail to give a limiting instruction on the purpose of evidence of other crimes when the challenged evidence is admissible independently of K.S.A. 60-455."* (Emphases added.) *Bly*, 215 Kan. at 175-76.

Since *Bly*, K.S.A. 60-455 avoidance techniques have grown in number and variety; and we have reached that clichd point when the exceptions threaten to swallow the rule.

The expansion of the marital discord exception to K.S.A. 60-455 for spousal homicide cases is illustrative. It now covers many violent relationships—between husband and wife, between separated and divorced spouses, between cohabitant and noncohabitant lovers, even between neighbors who have had a sexual relationship. See, *e.g., State v. Patton*, 280 Kan. 146, 167-72, 120 P.3d 760 (2005) (upholding admission of problems between spouses); *State v. Roberson*, 272 Kan. 1143, 1152-53, 38 P.3d 715, *cert. denied* 537 U.S. 829 (2002) (upholding admission of discord in sexual relationship between defendant, victim neighbor); *State v. Young*, 253 Kan. 28, 37, 852 P.2d 510 (1993) (upholding admission of abusive behavior toward live-in girlfriend before her murder); *State v. Mayberry*, 248 Kan. 369, 384-85, 807 P.2d 86 (1991) (upholding admission of problems between girlfriend, boyfriend); *State v. Green*, 232 Kan. 116, 119-23, 652 P.2d 697 (1982) (upholding admission of violence between separated spouses). We also have employed the marital discord avoidance technique to avoid reversal for failure to give a limiting instruction. See *State v. Green*, 232 Kan. at 119-21. And we have employed this technique even when it is conceded that

the same evidence was related to a material fact listed in K.S.A. 60-455. See *State v. Hedger*, 248 Kan. 815, 818-20, 811 P.2d 1170 (1991) (intent); *Green*, 232 Kan. at 121 (intent).

We also have approved admission of other crimes and civil wrongs evidence independent of K.S.A. 60-455 to show a continuing course of conduct on a defendant's part. See, *e.g., State v. McHenry*, 276 Kan. 513, 520, 78 P.3d 403 (2003) (prior acts of similar nature between same parties admissible independent of K.S.A. 60-455 to establish continuing course of conduct); *State v. Jones*, 247 Kan. 537, 544-47, 802 P.2d 533 (1990) (previous damage to window of ex-girlfriend's home admitted independent of K.S.A. 60-455 to show course of conduct in prosecution for damage to windows of ex-girlfriend's car). This has been true even though the evidence would have been admissible under the statute to show intent. See *State v. Crossman*, 229 Kan. 384, 387, 624 P.2d 461 (1981) (citing *State v. Fisher*, 222 Kan. 76, 85, 563 P.2d 1012 [1977]). In *Crossman*, the language of the opinion was limiting. This court said such evidence would be admissible independent of the statute *"in cases of crimes involving illicit sexual relations or acts between an adult and child."* 229 Kan. at 387. But the limiting language of *Crossman* was ignored in *State v. Carr*, 265 Kan. 608, 963 P.2d 421 (1998), where this court applied the *Crossman* avoidance technique to admit evidence of harsh discipline in a child abuse case not involving sexual acts. 265 Kan. at 623-25.

Introduction of other crimes and civil wrongs evidence independent of K.S.A. 60-455 merely to corroborate the testimony of a witness also has been deemed acceptable. See, *e.g., State v. Lee*, 263 Kan. 97, 104, 948 P.2d 641 (1997) (testimony of accomplices corroborated by testimony about illegal items, guns).

Our increasingly elastic approach to the admission of evidence of other crimes and civil wrongs is overdue for correction, as are the two problems that gave rise to the practice of admitting such evidence independent of K.S.A. 60-455.

We hereby state unequivocally that the list of material facts in K.S.A. 60-455 is exemplary rather than exclusive. It may be that other crimes and civil wrongs evidence is relevant and admissible to prove a material fact other than the eight listed. Should this be

a district judge's determination, however, the evidence must be subjected to the same sort of explicit relevance inquiries, particularized weighing of probative value and prejudicial effect, and prophylactic limiting instruction we have required when any other K.S.A. 60-455 evidence is admitted.

This enables our return to sensible application of K.S.A. 60-455 and puts an end to the practice of admission of other crimes and civil wrongs evidence independent of it. It recognizes that the list in the statute has always been inclusive rather than exclusive, and that the several ways around application of and safeguards attendant to K.S.A. 60-455 must be abandoned, not only because they lack reliable precedent but because they were never necessary in the first place. Other crimes and civil wrongs evidence that passes the relevance and prejudice tests we have set up and is accompanied by an appropriate limiting instruction should always have been admissible, even if the particular material fact on which it was probative was not explicitly set forth in the statute. It never actually required a specially designed rule to admit it independent of the statute. Rather, such evidence, if permitted to do so, would have fallen squarely within it. We disapprove any language to the contrary in our previous opinions. Henceforth, admissibility of any and all other crimes and civil wrongs evidence will be governed by K.S.A. 60-455.

Under this reinvigorated reading of K.S.A. 60-455, should a district judge neglect to apply the safeguards we have outlined to any other crimes or civil wrongs evidence, we will find error. But we also hereby unequivocally resolve the second problem that has plagued our cases in this area: We explicitly recognize that the admission of K.S.A. 60-455 evidence without the explicit relevance inquiries, particularized weighing of probative value and prejudicial effect, or prophylactic limiting instruction is not inevitably so prejudicial as to require automatic reversal. On the contrary it may be harmless. And we disapprove any language to the contrary in our previous opinions.

Our opinion in *State v. Ralls,* 213 Kan. 249, 515 P.2d 1205 (1973), a case cited in *Bly,* demonstrates one situation in which we have already ruled that omission of a limiting instruction was harm-

less. In *Ralls,* the defendant introduced K.S.A. 60-455 evidence during his own direct examination. We therefore held that he waived protection under the statute. *Ralls,* 213 Kan. at 255-56. We have relied on a waiver in other cases as well. See *Wilbanks v. State,* 224 Kan. 66, 579 P.2d 132 (1978); *State v. Greene,* 214 Kan. 78, 82, 519 P.2d 651 (1974), *disapproved on other grounds by State v. Scott,* 210 Kan. 426, 432-33, 502 P.2d 753 (1972); *State v. Hale,* 206 Kan. 521, 524-25, 479 P.2d 902 (1971); *State v. Pappan,* 206 Kan. 195, 197, 477 P.2d 989 (1970). And we have recently indicated less commitment to automatic reversal for K.S.A. 60-455 admission and exclusion errors. See *State v. Tatum,* 281 Kan. 1098, 1112-13, 135 P.3d 1088 (2006). And at least one case predating K.S.A. 60-455 treated omission of a limiting instruction as harmless error. See *Cruse,* 112 Kan. at 496 (failure to limit use of evidence to prove motive).

The application of harmlessness analysis to omission of a K.S.A. 60-455 limiting instruction also has the virtue of harmonious coexistence with statutory changes on jury instructions made since *Roth* held failure to give such an instruction automatically reversible. K.S.A. 62-1447, the provision *Roth* relied upon to place an inflexible duty to instruct upon the trial judge, has been repealed and replaced by K.S.A. 22-3414, which provides:

"The judge shall instruct the jury at the close of the evidence before argument and the judge, in the judge's discretion, after the opening statements, *may* instruct the jury on such matters *as in the judge's opinion* will assist the jury in considering the evidence as it is presented. . . .

. . . .

"No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction or the failure to give an instruction is clearly erroneous." (Emphasis added.) K.S.A. 2005 Supp. 22-3414(3).

In short, a trial judge should give such a K.S.A. 60-455 limiting instruction, but the failure to do so, though error, will no longer demand automatic reversal. Where the complaining party neither requested the instruction nor objected to its omission, the failure to give the instruction will be reversible only if clearly erroneous.

*State v. Pabst*, 273 Kan. 658, 660, 44 P.3d 1230, *cert. denied* 537 U.S. 959 (2002). " 'Instructions are clearly erroneous only if the reviewing court is firmly convinced there is a real possibility that the jury would have rendered a different verdict if the error had not occurred.' [Citation omitted.]" *State v. Shirley*, 277 Kan. 659, 666, 89 P.3d 649 (2004). In the event a K.S.A. 60-455 limiting instruction was sought at trial and refused in error, we will examine the error for harmlessness under the typical rule of K.S.A. 60-261 (error must be "inconsistent with substantial justice").

Applying the foregoing template to this case, we are satisfied that the Adriano and Malin testimony about prior violence between Gunby and Sharp would have survived the K.S.A. 60-455 explicit relevance inquiries and particularized weighing of probative value and prejudicial effect. The district judge's failure to give a limiting instruction, in contrast, was error. This error, however, does not require reversal. The rest of the evidence against Gunby was truly overwhelming. It included other testimony about the disturbing and sometimes violent and sexual relationship between Gunby and Sharp. None of this other testimony—which included Jaynes' testimony about the names Gunby called Sharp, Adriano's characterization of Gunby as a jealous ex-boyfriend, and Gunby's own characterization of the murder as the fulfillment of his earlier prophecies—is challenged on this appeal.

## Res Gestae

The other basis upon which the trial court justified admission of the Adriano and Malin testimony was that it was "part of the *res gestae* of the situation." Res gestae has been employed in numerous cases as an alternate path for admission of evidence of other crimes and civil wrongs. See, *e.g., State v. Baker*, 255 Kan. 680, 687-88, 877 P.2d 946 (1994) (classic "res gestae situation"; events so closely linked with crime charged that facts cannot be understood without inclusion of prior events; evidence thus admissible independent of K.S.A. 60-455). Having explained the correct interpretation of K.S.A. 60-455, we also reject res gestae as a legitimate independent basis for the admission of other crimes and civil wrongs evidence in Kansas. Any other crimes and civil wrongs evidence that may be

characterized as res gestae should henceforth be analyzed under K.S.A. 60-455.

"The phrase res gestae has long been not only entirely useless, but even positively harmful. It is useless, because every rule of evidence to which it has ever been applied exists as a part of some other well-established principle and can be explained in the terms of that principle. It is harmful, because by its ambiguity it invites the confusion of one rule with another and thus creates uncertainty as to the limitations of both. It ought therefore wholly to be repudiated as a vicious element in our legal phraseology." 6 Wigmore, Evidence § 1767, p. 255 (Chadbourn rev. 1976).

At common law, res gestae was an exception to the hearsay rule. As Professor Dennis Prater and Virginia Klemme have explained in their article on the history of the use of res gestae in Kansas, "It was a confusing mass of common law rules concocted to permit the introduction of out-of-court statements into evidence over a hearsay objection." Prater & Klemme, *Res Gestae Raises Its Ugly Head*, 65 J.K.B.A. 24 (October 1996). Over time, the concept evolved until it

"was vastly downsized to mean the present sense impression and the excited utterance concepts. . . . . Each concept had a famous advocate. Thayer is credited with advancing the theory of present sense impressions. Wigmore was the champion for excited utterances. It was a battle between contemporaneous statements (Thayer) and spontaneous statements (Wigmore) with each side believing their exception was more reliable than the other." 65 J.K.B.A. at 26.

At the federal level, the debate was resolved when the Federal Rules of Evidence were enacted. Both concepts were included. See Fed. R. Evid. 803(1) (present sense impression); Fed. R. Evid. 803(2) (excited utterances). As a result, as one federal court declared: "The old catchall, 'res gestae,' is no longer part of the law of evidence." *Miller v. Keating*, 754 F.2d 507, 509 (3d Cir. 1985); see *Stephens v. Miller*, 13 F.3d 998, 1003 (7th Cir. 1994).

Certain of our sister states have adopted the same approach. See, *e.g.*, *Bynote v. National Super Markets, Inc.*, 891 S.W.2d 117, 121 (Mo. 1995) (holding Missouri "will no longer recognize the phrase 'res gestae' as carrying sufficient meaning to support either the admission of or an objection to proffered testimony"); see also Chris Blair, *Let's Say Goodbye to Res Gestae*, 33 Tulsa L.J. 349,

354-55 (1997) (Oklahoma courts eliminated use of phrase in context of hearsay; concept not explicitly rejected in context of uncharged misconduct).

"The Kansas experience is similar. In 1953-54, M.C. Slough wrote an exhaustive three-part article tracing the history of res gestae in Kansas. Although there are some early departures, the vast majority of Kansas cases deal with the Thayer-Wigmore debate. Slough, in a manner similar to Morgan, demonstrates that the departures are inappropriate applications of res gestae.

"Slough then discusses the development of the lingering res gestae debate in Kansas. For our purposes, it is enough to say that the Kansas court mixed and matched the theories with a good deal of confusion.

"In any event, the debate was resolved in Kansas, in 1963, when the legislature enacted the Kansas Rules of Evidence." Prater & Klemme, 65 J.K.B.A. at 26-27 (citing Slough, *Res Gestae*, 2 Kan. L. Rev. 41, 2 Kan. L. Rev. 121, 2 Kan. L. Rev. 246 [1954]).

In enacting K.S.A. 60-460(d)(1) (present sense impression) and K.S.A. 60-460(d)(2) (excited utterance), the legislature incorporated "both aspects of the res gestae debate in the statute. As was the case with the . . . Federal Rules, res gestae, with nothing left to mean, was legislated out of our evidence vocabulary." 65 J.K.B.A. at 27. As such, "the rules of evidence have been codified and govern in all cases notwithstanding the prior case law which might be inconsistent with the statute." *State v. Jones,* 204 Kan. 719, 728, 466 P.2d 283 (1970); see also *State v. Sanders,* 258 Kan. 409, 424, 904 P.2d 951 (1995) (Six, J., concurring) (res gestae would create exception to hearsay not contained in K.S.A. 60-460[d]).

Despite all of this history, in *State v. Gadelkarim,* 256 Kan. 671, 887 P.2d 88 (1994), this court continued to rely upon res gestae, not only as the basis for admission of hearsay but to justify the admission of evidence regarding other crimes. The court stated:

"Res gestae evidence is that evidence which does not constitute a portion of crimes charged but has a natural, necessary, or logical connection to the crime. [Citation omitted.] . . .

"Res gestae is a broader concept than an exception to the hearsay rule. It actually deals with admissibility of evidence of acts or declarations before, during, or after happenings of the principal event. Those acts done or declarations made before, during, or after the happening of the principal occurrence may be admitted as part of the res gestae where those acts or declarations are so closely con-

nected with the principal occurrence as to form in reality a part of the occurrence. [Citation omitted.] Res gestae includes those circumstances which are automatic and undesigned incidents of the particular litigated act, which may be separated from the act by lapse of time but are illustrative of such act. It is the whole of the transaction under investigation or being litigated and every part of it. Acts done or declarations made before, during, or after the principal occurrence may be admissible as part of the res gestae to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake." 256 Kan. at 687-88.

Not only was this holding, by its own terms, "broader" than the common-law hearsay principle, the court applied the res gestae concept in a new way, concluding:

"Evidence of an independent [criminal] offense is admissible in a criminal action if it is relevant as to the res gestae of the crime. As discussed previously, res gestae evidence is that evidence which does not constitute a portion of the crimes charged but has a natural, necessary, or logical connection to the crime." 256 Kan. at 690.

This passage describes a valid basis for a determination that certain evidence is relevant. See K.S.A. 60-401(b). But mere relevance is not an adequate reason to bypass rules of exclusion. K.S.A. 60-407 states that "all relevant evidence is admissible" except that evidence which is excluded under a statute. The doctrine of res gestae is not only an improper basis for circumventing the exclusion of hearsay evidence; it does not provide a basis for circumventing K.S.A. 60-455. Given this, it is especially remarkable that the *Gadelkarim* court listed motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake—the list of elements of proof from K.S.A. 60-455—as the basis for defining res gestae. Doing so made it apparent that the doctrine, as recognized by the court, was identical in form to the statute. Yet the *Gadelkarim* court gave no explanation for why the attachment of the label "res gestae," meant the statute and its safeguards could otherwise be ignored. The words of Professor Edmond Morgan seem particularly appropriate: "The marvelous capacity of a Latin phrase to serve as a substitute for reasoning, and the confusion of thought inevitably accompanying the use of inaccurate terminology, are nowhere better illustrated than in the decisions dealing with the admissibility

of evidence as 'res gestae.' " Morgan, *A Suggested Classification of Utterances Admissible as Res Gestae*, 31 Yale L.J. 229 (1922).

This case provides an opportunity to end this particular confusion of thought, and we hereby do so. The concept of res gestae is dead as an independent basis for admissibility of evidence in Kansas. That evidence may be part of the res gestae of a crime demonstrates relevance. But that relevance must still be measured against any applicable exclusionary rules. Thus the district judge's admission of the Adriano and Malin testimony about earlier violence between Gunby and Sharp as res gestae was error. For the reasons outlined in the previous section of this opinion, that error was not reversible.

### Prosecutorial Misconduct

Although Gunby no longer challenges the premeditation instruction given by the district judge and to which the jury was referred again during deliberations, he does take issue with the prosecutor's discussion of premeditation during closing argument. Gunby's counsel did not object to this discussion at trial, but a defendant need not object to alleged prosecutorial misconduct in order to preserve the issue for appeal. The same standard of review applies regardless of whether an objection was made. See *State v. Davis*, 275 Kan. 107, 122, 61 P.3d 701 (2003). We have also said that a misstatement of controlling law, such as that alleged here, may deny a criminal defendant his or her right to due process; thus the alleged error must be reviewed on appeal despite the absence of an objection at trial. *State v. Morton*, 277 Kan. 575, 583-84, 86 P.3d 535 (2004).

We use a two-step analysis to determine when prosecutorial misconduct is alleged on appeal. We ask: (1) whether the complained-of conduct was outside the considerable latitude given a prosecutor in discussing the evidence; and (2) whether the remarks constitute plain error, that is, whether the statements prejudiced the defendant and denied him or her a fair trial. *State v. Tosh*, 278 Kan. 83, 93, 91 P.3d 1204 (2004).

A deliberate misstatement of the governing law is outside the considerable latitude given to prosecutors, and several of the pros-

ecution's statements are troubling in this regard: (1) "[P]remeditation can occur after the chain of events," (2) "[A]t some point after he started hitting and strangling her . . . [the defendant] made the conscious decision, 'I want to kill you' . . . [and] that's when he premeditate[d]," (3) A defendant "cannot intentionally strangle somebody to death without there being premeditation," and (4) It is "impossible to intentionally strangle somebody to death without knowing, thinking and wanting that person to die [and] that is all that is required for premeditation . . . that is the premeditation."

It appears that these remarks defined premeditation somewhere between the level of forethought outlined in the PIK instruction we have endorsed, see *State v. Morton*, 277 Kan. 575, 584, 86 P.3d 535 (2004), and the "instantaneous" timing we have disapproved. See *Morton*, 277 Kan. at 584; *State v. Pabst*, 273 Kan. 658, 662, 44 P.3d 1230, *cert. denied* 537 U.S. 959 (2002); *State v. Holmes*, 272 Kan. 491, 499-500, 33 P.3d 856 (2001).

Among our precedents regarding manual strangulation and premeditation, *State v. Scott*, 271 Kan. 103, 21 P.3d 516 (2001), is one of the most similar factually. The victim in *Scott* had been strangled, "most likely manually," and there was blunt force trauma to her head. 271 Kan. at 105. The strangulation had been prolonged and followed an argument and struggle. *Scott*, 271 Kan. at 108.

On appeal, the defendant challenged the sufficiency of the evidence to support the jury's finding of premeditation. We held that his "continued application of pressure over a period of time [was] sufficient for a jury to find that [the victim's] death was premeditated." 271 Kan. at 108. Further, "premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct," but premeditation "does not have to be present *before* a fight, quarrel, or struggle begins. Premeditation is the time of reflection or deliberation. Premeditation does not necessarily mean that an act is planned, contrived, or schemed beforehand. . . . Indeed, death by strangulation can be strong evidence of premeditation." 271 Kan. at 108-09 (citing *State v. Brown*, 234 Kan. 969, 676 P.2d 757 [1984]) (struggle, beating, and a prolonged strangulation sufficient to show premeditation).

Our recent decision in *State v. Jones*, 279 Kan. 395, 109 P.3d 1158 (2005), also involved a situation somewhat similar to this case. The victim had been manually strangled, and we reaffirmed *Scott's* holding that a jury can find a defendant's state of mind changed from mere intent to premeditation at any time during the violent episode that ultimately causes the victim's death, including at any time during a strangulation. *Jones*, 279 Kan. at 404.

With these cases in mind, we regard the prosecutor's statements in this case as barely outside the broad latitude permitted him in discussing the evidence in this case. We also are satisfied that whatever error they may have injected into the trial was harmless. On the facts of this crime, the prosecution's comments were not gross and flagrant; we see no evidence of ill will, as the prosecutor also directed the jury's attention more than once to the correct language in the PIK instruction; and the evidence against Gunby was direct and overwhelming. See *Tosh*, 278 Kan. at 93. In addition, when the members of the jury sought further guidance on premeditation from the district judge during deliberations, he properly directed them back to the PIK instruction. This response also ameliorated any error in the prosecutor's statement of the law. Both the harmlessness tests of K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), are met. See *Tosh*, 278 Kan. at 97-98.

### *Nullification of K.S.A. 21-3109*

Gunby next argues that the district court erred in instructing the jury: "If you do not agree that the defendant is guilty of [premeditated first-degree murder], you should then consider" lesser included offenses. This error, Gunby asserts, was compounded when the prosecutor told jurors that Kansas law demands a "top-to-bottom" evaluation of the possible offenses committed, with the question of whether Gunby committed premeditated first-degree murder to be considered first and the inquiry ending there if he was found guilty of that crime. In Gunby's view, the instruction and the argument worked together to nullify K.S.A. 21-3109. That statute requires that a defendant be presumed innocent until proven guilty beyond a reasonable doubt; it also requires that, if reasonable

doubt exists as to which of two or more degrees of a crime was committed, the defendant be convicted of only the less serious one.

This issue is raised for the first time on appeal. No party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds of his or her objection, unless the instruction or the failure to give the instruction is clearly erroneous. K.S.A. 2005 Supp. 22-3414(3). Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *State v. Evans,* 270 Kan. 585, 588, 17 P.3d 340 (2001).

Gunby acknowledges this court's decision in *State v. Roberson,* 272 Kan. 1143, 1155, 38 P.3d 715 (2002), which rejected the same argument. See *State v. Korbel,* 231 Kan. 657, 661, 647 P.2d 1301 (1982). He maintains, however, that jurors are bound to read the instruction to require that they reach a *unanimous* decision that no first-degree murder occurred before they are permitted to consider lesser offenses. We do not see this interpretation as a reasonable possibility. Moreover, Gunby's reliance on the Court of Appeals' decision in *State v. Cribbs,* 29 Kan. App. 2d 919, 924, 34 P.3d 76 (2001), is unpersuasive. In that case the panel dealt with the very specific simultaneous comparison necessary between the elements of voluntary manslaughter and second-degree murder. Gunby got the instruction sought in *Cribbs.* Nothing done by the district judge or prosecutor impaired it. Otherwise, ordered consideration of the charged offense and the lesser included offenses was appropriate. It did no violence to the presumption of innocence, nor did it in any manner nullify K.S.A. 21-3109. See *State v. Brown,* 280 Kan. 65, 118 P.3d 1273 (2005); *State v. Hurt,* 278 Kan. 676, 685, 101 P.3d 1249 (2004).

### *Cumulative Error*

Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied him or her a fair trial. *State v. Holmes,* 278

Kan. 603, 641, 102 P.3d 406 (2004). No reversal is necessary under the cumulative effect rule if the evidence against the defendant is overwhelming. *Holmes*, 278 Kan. at 641.

Gunby's trial was not perfect. The district judge's stated reasons for admitting Adriano's and Malin's testimonies on the previous violent incident or incidents between Gunby and Sharp were erroneous. The prosecutor overstepped in his argument regarding premeditation. However, we still regard the evidence in this case as unavoidably damning. Gunby crowed about the murder of Sharp at his first opportunity. Jaynes saw Sharp's body and testified about assisting with clean-up of the crime scene and with moving the body out of the bedroom and nearer to Gunby's car. He saw Gunby put the body in the trunk where police later found it. Gunby's statements at the time of his arrest indicated no surprise that the police were looking for him, only fear that his mother would be told what he had done. Despite imperfection, Gunby's trial on this abundance of incriminating evidence was fair.

Affirmed.

LOCKETT, J., Retired, assigned.

MCFARLAND, C.J., dissenting: I write separately to express my disagreement with that portion of the majority opinion that restricts the admissibility of all prior crimes evidence to what is permissible under K.S.A. 60-455 and the restrictions thereon.

The majority reasons that the practice of admitting evidence independent of K.S.A. 60-455 came about as the result of case law mistakenly construing the list of material facts as exclusive rather than exemplary, combined with development of the rule requiring automatic reversal in cases in which K.S.A. 60-455 evidence was admitted without a limiting instruction. According to the majority, these two factors led the court to develop the rule admitting evidence of prior similar acts between the defendant and the victim

independent of K.S.A. 60-455 in the marital discord and child sexual abuse context as "avoidance techniques." Thus, the majority concludes that the admissibility of prior acts between the defendant and the victim grew out of the restrictions of K.S.A. 60-455.

Actually, the admissibility of relevant prior acts between the defendant and the victim was established long before the enactment of K.S.A. 60-455 in 1963. In *State v. Owen*, 162 Kan. 255, 259, 176 P.2d 564 (1947), we said:

"The general rule, however, is that the commission of the offense for which a person is on trial cannot be proved by evidence that such person committed another but *independent offense* although it be of the same sort. The basic rule is well stated in 22 C.J.S., Criminal Law § 682, as follows:

'The general rule, which is subject to exceptions stated in §§ 683-690, *infra*, is that, on a prosecution for a particular crime, evidence which shows or tends to show that accused has committed another crime *wholly independent of, and unconnected with, that for which he is on trial*, even though it is a crime of the same sort, is irrelevant and inadmissible, and such evidence of an independent crime is inadmissible for the reason, among others, that it ordinarily does not tend to establish the commission by accused of the offense charged, that accused must be tried for one offense at a time, and that, in accordance with the more extensive general rule, which applies to all cases, civil or criminal, the evidence must be confined to the point in issue.' " (Emphasis added.)

K.S.A. 60-455, and the common law upon which it was based, was designed and intended to apply only to evidence of other crimes not in any way connected with that charged in the information. We said in *State v. Wright*, 194 Kan. 271, 274, 398 P.2d 339 (1965) (citing *State v. Kirby*, 62 Kan. 436, 63 Pac. 752 [1901]):

"As early as the turn of the century the general rule was recognized that testimony as to the commission of offenses by a defendant in a criminal case, *not in any way connected with that charged in the information*, and which would tend to degrade and prejudice him, should be carefully excluded from the jury." (Emphasis added.)

*State v. Borchert*, 68 Kan. 360, 74 Pac. 1108 (1904), is illustrative. The defendant in *Borchert* was charged with rape of his minor daughter. The State introduced evidence of a number of similar acts between the defendant and the daughter. On appeal, the defendant argued the admission of the other criminal acts violated

the rule that "it is not competent in a prosecution for one offense to show that the defendant is guilty of another similar offense merely for the purpose of enabling the jury to infer that as he had committed one crime he would be likely to commit another." 68 Kan. at 361 (discussing *State v. Stevens*, 56 Kan. 720, 44 Pac. 992 [1896]).

The *Borchert* court disagreed that this rule applied. The court clarified that evidence of prior similar offenses between the defendant and the prosecuting witness in a sex crimes case is admissible, *not* as an exception to the general rule that one crime cannot be proved in order to establish an independent crime, but rather, *in spite of that rule* because it supports the charge by showing the relationship of the parties and corroborates the direct evidence of the crime charged. 68 Kan. at 361-62.

The court's conclusion in *Borchert* is based on the fundamental recognition that such evidence is inherently connected with the evidence proving the crime charged and, thus, is not subject to the rule concerning the admissibility of other, unrelated crimes—even as an exception. This recognition, not a need to avoid the harsh application of K.S.A. 60-455, served as the basis for post-K.S.A. 60-455 expression of the rule that prior similar acts between the same parties are admissible independent of K.S.A. 60-455. See *State v. Bly*, 215 Kan. 168, 175-76, 523 P.2d 397 (1974) (evidence disclosing another criminal offense which has a *direct bearing on and relation to* the commission of the offense itself is not governed by K.S.A. 60-455 and is admissible without a limiting instruction).

A review of just two of the cases in which we have held admissible evidence of prior similar conduct between the same parties illustrates how such evidence is inherently related to and connected with the crime charged.

In *State v. Crossman*, 229 Kan. 384, 387, 624 P.2d 461 (1981), we held that in cases involving illicit sexual relations or acts between an adult and child, evidence of prior acts of a similar nature between the defendant and the same victim is admissible without the safeguards required by K.S.A. 60-455, where it is offered to establish the relationship of the parties, the existence of a continuing course of conduct between the parties, or to corroborate the

testimony of the complaining witness as to the act charged. 229 Kan. at 387.

The defendant in *Crossman* was charged with indecent liberties and aggravated sodomy committed against his stepdaughter. The family dynamics among the child victim, her mother, her stepfather, and her siblings were an integral part of the case, as explained in the opinion:

"The complaining witness testified extensively as to the complex family relationship among herself, her mother, her stepfather, her sister and her five brothers. Defendant is portrayed as a domineering and brutal man. The mother-daughter relationship is one of constant quarreling and bickering. The sexual relationship between the complaining witness and defendant extended over several years in varying degrees. Being the object of defendant's sexual desire had actually aided the complaining witness in two respects: (1) defendant ceased his severe discipline of her, and (2) defendant took the child's side in her frequent disputes with her mother. The mother testified as a defense witness and was supportive of defendant, stating she did not believe the child. The prosecution introduced evidence that on one occasion several years earlier the mother had summoned the police for defendant's sexual molestation of the child." 229 Kan. at 385.

In holding such evidence was admissible independent of K.S.A. 60-455, we noted that the defense strategy was to portray the victim as a mentally unstable child who had made up the allegations. Thus, with her veracity as the key issue in the trial, answers to why she tolerated the situation so long before reporting it, why she did not discuss the allegations with her mother, etc. made the whole family relationship, including prior sexual acts with the defendant, highly relevant to the crime charged. 229 Kan. at 387.

More recently, evidence of similar prior sexual conduct with the complaining witness was held admissible independent of K.S.A. 60-455 in *State v. McHenry*, 276 Kan. 513, 78 P.3d 403 (2003), under virtually the same scenario as in *Crossman*:

"Like *Crossman*, McHenry's defense was to attack the veracity of his daughter and the other family members. McHenry's theory was that the rest of his family concocted allegations of sexual abuse in order to remove him from the home. He called a defense witness who testified that the daughter had stated she could get whatever she wanted from McHenry by claiming he had sexually abused her. Given McHenry's attack on his family's credibility, the evidence of his prior sexual abuse of his daughter falls squarely within the *Crossman* rule. The evidence showed that the relationship between McHenry and his daughter had involved a

continuing course of conduct (ongoing sexual abuse) with McHenry gaining control through the extension or withholding of privileges. The evidence provided information for the jury to consider in assessing the defense: the timing of the past complaint in the context of other family dynamics at the time; the fact that past complaints had not resulted in action by those in authority; and a long-standing system of rewards which might explain the daughter's failure to come forward." 276 Kan. at 520-21.

Let us examine some other possible scenarios: A 10-year-old child is asleep in her bedroom, which shares a common wall with the bedroom where her mother is asleep. Mother's live-in boyfriend comes into the girl's bedroom, touches her shoulder to awaken her, and then snaps his fingers. The girl immediately performs oral sex on the boyfriend and he leaves the room. Not a word is spoken. The girl testifies the mother's boyfriend had forced her to do this numerous times in the past, had threatened her with bodily harm, and that her mother accused her of lying when she reported prior incidents and beat her. The prior criminal activity is an integral part of the charged crime and has always been admissible independent of K.S.A. 60-455.

Take another example: Husband calls his wife, is very angry, and states he is on his way home to beat her up. She does not leave, does not call 911, or in any way seek protection. Instead, she cowers and waits. Why? Husband has beaten her up on many previous occasions. When she had tried to escape, called 911, or otherwise sought protection, subsequent beatings in retaliation for such acts were more severe, including threats to kill her if she tried anything like that again. The prior criminal acts are an integral part of the present crime.

As these cases and hypothetical scenarios show, prior criminal acts by a defendant against the same victim are frequently necessary to understand the victim's actions or inactions prior to, during, or after the commission of the charged crime. Such evidence does not concern prior, separate, unrelated crimes that are not connected to the crime charged—the type of evidence intended to be covered by K.S.A. 60-455. Instead, such evidence is inherently related to and interconnected with the crime charged and, thus, tends to prove the offense. Accordingly, it is admissible despite the fact it tends to show the commission of other crimes.

This is vastly different from the admission of totally independent crimes. An example of this would be attempting to prove the identity of the defendant as the masked robber of a liquor store (the charged crime) by introducing evidence that the defendant had been convicted 2 years earlier of being the masked robber of another liquor store. As we recognized in *Crossman*, certainly the restrictions of K.S.A. 60-455 are intended to apply to such a scenario:

"Probably the most common use of K.S.A. 60-455 involves the issue of identity. For example, a liquor store is robbed. There is no question that the store was robbed. The only issue is who did it. The prosecution then seeks to introduce evidence that the defendant has previously committed another robbery on a specified date, utilizing a similar *modus operandi*. The purpose of the evidence is to establish that the defendant was the robber of the liquor store. The utilization of one specific crime to prove a *separate and independent* crime is a sensitive area which needs safeguards." (Emphasis added.) 229 Kan. at 387.

In summary, K.S.A. 60-455, and the common law upon which it was based, was never intended to apply to evidence that is admissible due to its inherent connection to the crime charged. Such evidence, otherwise admissible, is not rendered inadmissible merely because it also tends to show the defendant has committed some other crime. I dissent from that portion of the majority opinion which holds otherwise.

LOCKETT, J., Retired, joins in the foregoing dissenting opinion.